PEOPLE OF THE STATE OF NEW YORK ON THE RELATION OF KENNEDY *v.* BECKER, AS SHERIFF OF ERIE COUNTY.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 666.   Argued April 7, 1916.—Decided June 12, 1916.

Power to preserve fish and game within its border is inherent in the sovereignty of the States subject to any valid exercise of authority under the provisions of the Federal Constitution.

The reservation to the Seneca Tribe of hunting and fishing privileges on the lands conveyed to Robert Morris by the treaty of the Big Tree of 1797 was one in common with the grantees and others to whom the privilege might be extended, but subject to the necessary power of appropriate regulation by the State having inherent sovereignty over the land.

Tribal Seneca Indians are subject to the fish and game laws of the State of New York as to lands ceded by the Tribe to Robert Morris by the Big Tree Treaty of 1797 and which are not within the Seneca Indian Reservation notwithstanding the reservation of hunting and fishing contained in said Treaty.

The fact that the Indians in this case are wards of the United States un-

der the care of an Indian agent does not derogate from the authority of the State to enforce its fish and game laws as against Indians on territory within the State and outside of any Indian reservation. 215 N. Y. 42, affirmed.

THE facts, which involve the construction of the Big Tree Treaty of 1797 between the Seneca Indians and Robert Morris and the effect of a reservation of right to fish and hunt on the ceded lands and also the power and sovereignty of the State of New York over the said lands, are stated in the opinion. ·

*Mr. George P. Decker* for plaintiff in error and also *Mr. Charles Warren,* Assistant Attorney General of the United States, with whom *Mr. W. W. Dyer* was on the brief for the United States in support of the contentions of plaintiff in error:

The clause of the treaty relating to fishing and hunting rights is to be construed as reserving to the Indians a free and perpetual right to take fish and game on the lands ceded, at least for their own subsistence and by the means and methods then known and practiced by them. ·

The Seneca and other New York tribal Indians are wards, not of the State, but of the United States.

The hunting and fishing rights involved are a part of the original Indian rights of occupancy, reserved in the very instrument of cession, never relinquished, and continuously held under the ancient Indian title. The *locus in quo,* therefore, always remained an Indian reservation *pro tanto.*

The reserved rights of hunting and fishing are secured to the Seneca Indians by the word of the United States given at a public treaty, which is the supreme law of the land.

The operation of the state fish and game laws was excluded by the exercise of Federal power. See the Hartford Convention; the Treaty of the Big Tree; the Indian

Intercourse Act of May 19, 1796, § 12; Extracts from Stone's Life of Red Jacket, and the following cases: *In re Blackbird,* 109 Fed. Rep. 139; *Choctaw Nation v. United States,* 119 U. S. 1, 27; *Dick v. United States,* 208 U. S. 40; *Eubank v. Richmond,* 226 U. S. 137; *Fellows v. Blacksmith,* 19 How. 366; *Geer v. Connecticut,* 161 U. S. 519; *Geofroy v. Riggs,* 133 U. S. 258; *George v. Pierce,* 85 Misc. Rep. 105; *Holden v. Joy,* 17 Wall. 211; *Johnson v. Gearlds,* 234 U. S. 422; *Jones v. Meehan,* 175 U. S. 1; *The Kansas Indians,* 5 Wall. 737, 760; *In re Lincoln,* 129 Fed. Rep. 247; *The New York Indians,* 5 Wall. 761; *Nor. Pac. Ry. v. United States,* 227 U. S. 355, 362, 367; *Cusic v. Daly,* 212 N. Y. 183; *Perrin v. United States,* 232 U. S. 478, 484; *Sligh v. Kirkwood,* 237 U. S. 52, 58; *State v. Campbell,* 53 Minnesota, 354; *United States v. Forty-three Gallons of Whiskey,* 93 U. S. 188; *United States v. Kagama,* 118 U. S. 375, 384; *United States v. Pelican,* 232 U. S. 442; *United States v. Sandoval,* 231 U. S. 28; *United States v. Winans,* 198 U. S. 371; *Ward v. Race Horse,* 163 U. S. 504; *Winters v. United States,* 207 U. S. 564; *Worcester v. Georgia,* 6 Pet. 515, 581.

*Mr. Herbert B. Lee* and *Mr. Blaine F. Sturgis,* with whom *Mr. E. E. Woodbury,* Attorney General of the State of New York, and *Mr. A. Frank Jenks* were on the brief, for defendant in error:

New York State has jurisdiction to punish tribal Indians for violations of its laws enacted in the exercise of its police power when such violations occur outside the limits of their reservations.

The reservation of the privilege to fish and hunt on the lands ceded to Robert Morris by the treaty of "Big Tree" does not prevent the prosecution of Tribal Indians violating the Conservation Law on the lands covered by such reservation. See The Hartford Convention of December, 1786, and *Clairmont v. United States,* 225

U. S. 551; *Commonwealth* v. *Alger,* 7 Cush. 53, 84; *Compagnie Francaise &c.* v. *State Board of Health,* 186 U. S. 380; *Ex parte Tilden,* 218 Fed. Rep. 920; *Fletcher* v. *Peck,* 6 Cranch, 87; *Geofroy* v. *Riggs,* 133 U. S. 258; *Johnson* v. *M'Intosh,* 8 Wheat. 543; *New York &c. R. R.* v. *Bristol,* 151 U. S. 556; *Patsone* v. *Pennsylvania,* 232 U. S. 138; Tucker's Limitation on Treaty-Making Power, 381; *United States* v. *Kagama,* 118 U. S. 375; *Ward* v. *Race Horse,* 163 U. S. 504.

Mr. Chief Justice White delivered the opinion of the court after reading the following memorandum:

This opinion by direction of the court had been prepared by Mr. Justice Hughes and was approved before his resignation. After that event it was again considered and was re-adopted.

Fayette Kennedy, Warren Kennedy, and Willis White, Jr., three Seneca Indians, residing on the Cattaraugus Reservation, under the charge of an Indian Agent of the United States, were arrested for spearing fish in Eighteen Mile Creek, in Erie County, State of New York, at a place outside the Reservation, and there having certain fish in their possession, in violation of § 176 of the Conservation Law of that State. A justice of the peace committed them to the custody of the sheriff, and a writ of *habeas corpus* was sued out upon the ground that the commitment was invalid. It was alleged that the persons arrested were tribal Indians, as above stated, and that the place where the offense was committed was within the territory included in "certain grants . . . under sanction of the United States of America, whereby . . . the right was reserved to the said Indians to fish in the waters on and in said lands." The Supreme Court at Special Term discharged the petitioners, holding that the ancient grants, agreements and treaties mentioned, and

particularly the treaty made between the Seneca Nation of Indians and Robert Morris in the year 1797, permitted these Indians to fish in the waters in question "at will, and at all seasons of the year, regardless of the provisions of the game laws of the State of New York." The Appellate Division of the Supreme Court, Fourth Department, reversed the order and remanded the three Indians to custody (165 App. Div. 881); and the order of the Appellate Division was affirmed by the Court of Appeals. The court entertained the Federal question presented, and decided that the state law, notwithstanding the treaty, was applicable. 215 N. Y. 42.

Section 176 of the Conservation Law of New York prohibits the taking of fish, or having the same in possession, except as permitted by the article of which it is a part. The validity of these provisions with respect to those subject to the jurisdiction of the State is not questioned. The controversy relates solely to the state power over these Indians.

The argument for the plaintiffs in error has taken a wide range and embraces an extended history of the dealings with the Six Nations. We do not find it to be necessary to review this interesting history as the question to be determined is a narrow one. The *locus in quo* is within the State of New York being within one mile from the point where Eighteen Mile Creek empties into Lake Erie. It is not within the territorial limits of the Indian Reservation on which the Senecas reside. It is within the territory which was ceded by the Seneca Nation to Robert Morris by the treaty of the 'Big Tree,' of September 15, 1797 (7 Stat. 601), and the question turns upon the construction of this treaty, that is, on the consequences which attached to the reservation therein of fishing and hunting rights upon the lands then granted. These lands were a part of the tract covered by the compact made in 1786 between the State of New York and the

Commonwealth of Massachusetts known as the Hartford Convention. (Journals of Congress, Vol. IV, p. 787.) By the terms of this compact for the settlement of existing controversies, Massachusetts ceded, granted and released to New York all its "claim, right and title" to the "government, sovereignty and jurisdiction" of the lands, while New York ceded, granted and released to Massachusetts "the right of, preëmption of the soil from the native Indians, and all other the estate, right, title and property" which the State of New York had. Subsequently Massachusetts sold to Robert Morris its "preemptive right." By § 12 of the Federal Indian Intercourse Act of May 19, 1796, c. 30, 1 Stat. 469, 472, it was provided that no conveyance of lands "from any Indian, or nation or tribe of Indians" should be valid unless "the same be made by treaty, or convention, entered into pursuant to the constitution"; and this was subject to a proviso as to the proposal and adjustment of compensation by state agents in the presence and with the approval of commissioners of the United States. The lands in question were accordingly conveyed to Robert Morris by the treaty above mentioned. From the preamble (as shown by the original on file in the State Department, a copy of which has been produced by the Government) it appears that the conveyance was made under the authority of the United States, and in the presence of the United States Commissioner, and the treaty was proclaimed by the President after ratification by the Senate on April 11, 1798. The convention is in the form of an indenture by which (identifying the tract as being part of that embraced in the Hartford Convention) these lands were granted by the sachems, chiefs and warriors of the Seneca Nation to Robert Morris "his heirs and assigns forever." The lands—which were soon resold —thus passed by the conveyance into private ownership and were subject to the jurisdiction and sovereignty of the

State of New York. The grant contained the following reservation which is in question here:—"Also, excepting and reserving to them, the said parties of the first part and their heirs, the privilege of fishing and hunting on the said tract of land hereby intended to be conveyed."

The right thus reserved was not an exclusive right. Those to whom the lands were ceded, and their grantees, and all persons to whom the privilege might be given, would be entitled to hunt and fish upon these lands, as well as the Indians of this tribe. And, with respect to this non-exclusive right of the latter, it is important to observe the exact nature of the controversy. It is not disputed that these Indians reserved the stated privilege both as against their grantees and all who might become owners of the ceded lands. We assume that they retained an easement, or profit à prendre, to the extent defined; that is not questioned. The right asserted in this case is against the State of New York. It is a right sought to be maintained in derogation of the sovereignty of the State. It is not a claim for the vindication of a right of private property against any injurious discrimination, for the regulations of the State apply to all persons equally. It is the denial with respect to these Indians, and the exercise of the privilege reserved, of all state power of control or reasonable regulation as to lands and waters otherwise admittedly within the jurisdiction of the State.

It is not to be doubted that the power to preserve fish and game within its borders is inherent in the sovereignty of the State (*Geer* v. *Connecticut*, 161 U. S. 519; *Ward* v. *Racehorse*, 163 U. S. 504, 507), subject of course to any valid exercise of authority under the provisions of the Federal Constitution. It is not denied—save as to the members of this tribe—that this inherent power extended over the *locus in quo* and to all persons attempting there to hunt or fish, whether they are owners of the lands or others. The contention for the plaintiffs in error must, and does,

go to the extent of insisting that the effect of the reservation was to maintain in the tribe sovereignty *quoad hoc.* As the plaintiffs in error put it: "The land itself became thereby subject to a joint property ownership and the dual sovereignty of the two peoples, white and red, to fit the case intended, however infrequent such situation was to be." We are unable to take this view. It is said that the State would regulate the whites and that the Indian tribe would regulate its members, but if neither could exercise authority with respect to the other at the *locus in quo,* either would be free to destroy the subject of the power. Such a duality of sovereignty instead of maintaining in each the essential power of preservation would in fact deny it to both.

It has frequently been said that treaties with the Indians should be construed in the sense in which the Indians understood them. But it is idle to suppose that there was any actual anticipation at the time the treaty was made of the conditions now existing to which the legislation in question was addressed. Adopted when game was plentiful—when the cultivation contemplated by the whites was not expected to interfere with its abundance—it can hardly be supposed that the thought of the Indians was concerned with the necessary exercise of inherent power under modern conditions for the preservation of wild life. But the existence of the sovereignty of the State was well understood, and this conception involved all that was necessarily implied in that sovereignty, whether fully appreciated or not. We do not think that it is a proper construction of the reservation in the conveyance to regard it as an attempt either to reserve sovereign prerogative or so to divide the inherent power of preservation as to make its competent exercise impossible. Rather are we of the opinion that the clause is fully satisfied by considering it a reservation of a privilege of fishing and hunting upon the granted lands in common with the

grantees, and others to whom the privilege might be extended, but subject nevertheless to that necessary power of appropriate regulation, as to all those privileged, which inhered in the, sovereignty of the State over the lands where the privilege was exercised. This was clearly recognized in *United States* v. *Winans*, 198 U. S. 371, 384, where the court in sustaining the fishing rights of the Indians on the Columbia River, under the provisions of the treaty between the United States and the Yakima Indians, ratified in 1859, said (referring to the authority of the State of Washington): "Nor does it" (that is, the right of 'taking fish at all usual and accustomed places') "restrain the State unreasonably, if at all, in the regulation of the right. It only fixes in the land such easements as enable the right to be exercised."

We have assumed the applicability of the state law in question, as its construction is determined by the decision of the state court. We also assume that these Indians are wards of the United States, under the care of an Indian agent, but this fact does not derogate from the authority of the State, in a case like the present, to enforce its laws at the *locus in quo*. *Ward* v. *Racehorse, supra; United States* v. *Winans, supra.* There is no question of conflict with any legislation of Congress or with action under its authority; for the case rests on the construction of the treaty. The only action of Federal authority, that is pertinent, is found in the convention itself. It should be added that we have not considered any question relating to conduct or fishing rights upon territory, not ceded, which is comprised within the Indian Reservation; nor is it necessary to deal with other matters which have been discussed in argument touching the relation of the State of New York to the Indians within its borders.

We find no error in the judgment of the state court and it is accordingly affirmed.

*Judgment affirmed.*