ORGANIZED VILLAGE OF KAKE,
Plaintiff,

v.

William A. EGAN, Governor of the State of Alaska, Defendant.

ANGOON COMMUNITY ASSOCIATION,
Plaintiff,

v.

William A. EGAN, Governor of the State of Alaska, Defendant.

METLAKATLA INDIAN COMMUNITY, ANNETTE ISLANDS RESERVE, a federally chartered corporation, Plaintiff,

v.

William A. EGAN, Governor of the State of Alaska, and The State of Alaska, Defendants.

Civ. A. Nos. 8063–A, 8064–A, 8066–A.

United States District Court
D. Alaska,
First Division, Juneau.
July 1, 1959.

R. L. Jernberg, of Gore & Jernberg, Ketchikan, Alaska, and C. L. Cloudy, of Ziegler, Ziegler & Cloudy, Ketchikan, Alaska, for plaintiffs Village of Kake and Angoon Community Assn.

Robert H. Ziegler, Sr., and A. H. Ziegler, of Ziegler, Ziegler & Cloudy, Ketchikan, Alaska, for plaintiff Metlakatla Indian Community, Annette Islands Reserve.

John L. Rader, Atty. Gen. of Alaska, James M. Fitzgerald, Special Asst. Atty. Gen., and Douglas L. Gregg, Asst. Atty. Gen., for all defendants.

KELLY, District Judge.

The first two captioned cases were consolidated for trial, and the third was heard the following day. Because of the similarity of the actions, the three cases are consolidated for the purpose of this opinion.

The urgency of this matter makes immediate determination imperative. It would, of course, be desirable if my decision could be based on a written opinion as complete as the able briefs of counsel for both parties filed herein, but time does not permit the preparation of a formal opinion, so it must suffice that I announce my decision from the bench and do as well as possible from notes and excerpts from decisions.

I need hardly state that I agree with counsel on both sides in their expressed

regard for the importance of this action now before us for decision.

We have here a conflict between the authority of the Secretary of the Interior, an officer of the United States, and the Governor of Alaska. In this it is not a conflict of these officials as individuals or personalities, but of what they represent in this controversy.

We have in effect the state opposed to the United States. We have the majesty of the nation on one hand and the sovereignty of the state on the other; in between, three Indian communities whose plight in the dwindling fish economy of Alaska is a matter of grave concern.

Where the exercise of claimed state power and authority collides with the exercise of claimed federal power and authority, the difficult and tender problem of resolving, under existing law and judicial decisions, the questions thus arising, with due regard to the dignity of the one and the sovereignty of the other, becomes the delicate task of the Court.

Able and convincing arguments have been capably presented by counsel for both sides.

The facts are substantially agreed upon and are fully set forth in the pleadings, briefs and recorded statements of counsel.

After reading the pleadings and briefs, hearing the arguments, examining the exhibits and affidavits, and studying numerous authorities, I have concluded that the relief sought in these three cases must be denied and the bills of complaint therein dismissed.

I will try and state my reasons for this decision.

■ This Court can take judicial notice of the following facts and conditions and matters of general knowledge:

(1) There has long been growing opposition to fish traps in Alaska, and plebicites held in the Territory in connection therewith have resulted overwhelmingly in votes for the abolishment of traps.

(2) The three Indian villages here concerned as plaintiffs in these actions had voted overwhelmingly for the abolishment of traps.

(3) The salmon runs in Alaska are being rapidly depleted.

(4) The use of fish traps takes great numbers of fish from Alaskan waters for the benefit of the few who own or control the traps.

(5) Even with trap operations, many canneries have been compelled to close in Alaska in recent years, because of lack of an adequate fish supply.

(6) Traps were reduced over the years in number and curtailed in operation, and finally abolished by the state, the well-known purpose of which was to conserve the salmon supply for the benefit of all of the people of the state as a whole.

(7) Financial loss occurred to some who owned or controlled the traps each time they were cut in number or limited in operation.

I find the following statements of the law determinative of the issues in this case. The state owns the tidelands and controls all areas wherein traps were threatened to be installed. In other words, the proposed trap sites are located in inland waters over which the State of Alaska has dominion.

■ Mr. Justice Reed, in State of Alabama v. State of Texas, 347 U.S. 272, at page 275, 74 S.Ct. 481, at page 483, 98 L.Ed. 689, stated:

"If the marginal lands were thus declared by the California and following cases to belong to the United States, they were ceded to the states through the subsequent Submerged Lands Act of 1953 by the clause: 'Title to and ownership of the lands beneath navigable waters within the boundaries of the respective States, and the natural resources within such lands and waters * * * are hereby * * * recognized, confirmed, established, and vested in and assigned to the respective States * * *.' § 3(a), 43 U.S.C.A.

§ 1311(a). If, on the other hand, the marginal lands were not declared by those cases to belong to the United States, title to them remained in the respective states. Either by original ownership or by the cession of the Act, the lands are now the property of the respective states. * * * "

The new State of Alaska is entitled to such powers as have been given to all states by the Submerged Lands Act, 43 U.S.C.A. § 1301 et seq.

▆ "Indian fishing rights" do not include the right to fish with forbidden gear or in a manner prohibited to other citizens of the state.

No property right exists in fish traps and their use has been legally prohibited in the state.

The "equal footing" clause has long been held to refer to political rights and to sovereignty and to have a direct effect on certain property rights, and the question arose early in controversies between the states and the federal government as to ownership of the shores of navigable waters, and it was held that to deny to the states, admitted subsequent to the formation of the Union, ownership of this property, would deny them admission on an equal footing with the original states. Pollard's Lessee v. Hagan, 3 How. 212, 44 U.S. 212, 228–229, 11 L.Ed. 565, and cases cited.

▆ Upon the admission of a state to the Union the title of the United States to lands underlying navigable waters within the state passes to it as incident to the transfer to the state of local sovereignty and is subject only to the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce. United States v. State of Oregon, 295 U.S. 1, 14, 55 S.Ct. 610, 79 L.Ed. 1267.

The lands on which the fish traps are to be moored are tidelands or lands underlying inland waters, and subject to the authority of the state to regulate fishing.

Of course the United States has responsibility under laws passed by Congress toward the Indians. The United States has made treaties—solemn pacts with Indian nations. Indians have been accorded rights by the United States in Territories and in lands controlled by the United States, but many of these rights disappear when a new state is formed. Ward v. Race Horse, 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244. In this case, 163 U.S. on page 515, 16 S.Ct. on page 1080, Mr. Justice White stated as follows:

" * * * It may be further, for the sake of the argument, conceded that, where there are rights created by congress, during the existence of a territory, which are of such a nature as to imply their perpetuity, and the consequent purpose of congress to continue them in the State, after its admission, such continuation will, as a matter of construction, be upheld, although the enabling act does not expressly so direct. Here the nature of the right created gives rise to no such implication of continuance, since, by its terms, it shows that the burden imposed on the Territory was essentially perishable and intended to be of a limited duration. * * * "

See also Kennedy v. Becker, 241 U.S. 556, 36 S.Ct. 705, 60 L.Ed. 1166; United States v. Winans, 198 U.S. 371 (384), 25 S.Ct. 662, 49 L.Ed. 1089. An Indian reservation created by executive order of the President conveys no right of use or occupancy beyond the pleasure of Congress and the President.

When an Indian reservation is established by treaty the right of use or occupancy depends upon the language or the purpose expressed therein.

▆ Congress has power to make a reservation inclusive of the adjacent waters and submerged lands as well as uplands * * *. The reservation thus created is not a private grant but simply a setting apart "until otherwise provided by law."

504

Statutes passed for the benefit of dependent Indian tribes or communities are to be liberally construed, doubtful expressions being resolved in favor of the Indians. See Alaska Pacific Fisheries v. United States, 248 U.S. 78, at pages 87 and 89, 39 S.Ct. 40, 63 L.Ed. 138.

The reservation of the Metlakatla Indians was created at the will of Congress and did not constitute final disposal of the lands underlying the navigable waters. The extension of the 3,000 feet to include exclusive fishing rights by the President likewise did not constitute final disposal but only a grant "until otherwise provided by law." The federal government retained jurisdiction thereof until Alaska became a state but upon achieving statehood, dominion and sovereignty thereof passed to the new state, subject only to the authority of the federal government in regulating navigation and commerce. Pollard's Lessee v. Hagan, 3 How. 212, 44 U.S. 212, 11 L.Ed. 565. The presidential order which extended the exclusive fishing rights 3,-000 feet offshore simply prohibited others from fishing therein and cannot be construed to permit the use of traps therein when prohibited by state law.

Under territorial status the Annette Island natives could not claim any vested property right in any particular method or means for taking fish. Their authority to operate a fishery at all came from the Secretary of the Interior under the provisions of the White Act, 48 U.S. C.A. § 221 et seq.

The state regulates and controls wildlife resources and fisheries in the marginal sea. This was originally based on a concept of ownership. McCready v. State of Virginia, 94 U.S. 391, 24 L. Ed. 248. This theory has to some extent been repudiated and the modern concept contemplates that state control is founded upon the power to regulate in the state the protection of these resources for all the people.

The state has an absolute right to control and regulate the killing of game as its judgment deems best in the interest of its people. Geer v. State of Connecticut, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793. See also Skiriotes v. State of Florida, 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193; Toomer v. Witsell, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460; Corsa v. Tawes, D.C., 149 F.Supp. 771.

The right to control fisheries rests in the state in the absence of affirmative action of Congress. Manchester v. Commonwealth of Massachusetts, 139 U.S. 240, 11 S.Ct. 559, 35 L.Ed. 159.

Fish and game are owned by the states, not as proprietors, but in their sovereign capacity as the representatives and for the benefit of all their people in common. United States v. Shauver, D.C., 214 F. 154.

The White Act, 48 U.S.C.A. § 221, was passed by Congress to protect and conserve fisheries in Alaska. It was amended by Sec. 6(e) of the Alaska Statehood Act, 48 U.S.C.A. preceding section 23, which contained the so-called "Westland proviso." The constitution of the State of Alaska became effective simultaneously with the Statehood Act, and with it Ordinance Number Three, which for reasons therein stated, abolished the use of fish traps for the taking of salmon for commercial purposes in all the coastal waters of the state.

If the White Act is amended by Sec. 6(e) and by Ordinance Number Three as interpreted by the Secretary of the Interior (Ketchikan Packing Co. v. Seaton, D.C.Cir., 267 F.2d 660) then the White Act must prohibit the use of traps in Alaskan waters.

The Ketchikan Packing case holds that Congress intended the Secretary to be a trustee for both the federal government and the new state during the transition of administration from the federal to the state authorities "in the broad national interest." It further held that the Secretary, in that unique capacity, could not reasonably disregard a valid law of Alaska existing on January 3, 1959, the effective date of the Alaska Statehood

Act and the Alaska constitution, and Ordinance Number Three.

The authority conferred upon the Secretary by existing law, as above set forth, should not be permitted to impair the powers or rights of the new state which come from the status of statehood. To do otherwise would seem to impair the "equal footing" standing of the new state.

The White Act is still in effect and is the Act from which the Secretary of the Interior derived his authority, and this Act specifically states that "every such regulation made by the Secretary of the Interior shall be of general application within the particular area to which it applies and that no exclusive or several right of fishery shall be granted therein." Therefore the White Act forbids exclusive right of fishery. This was the holding in the case of Hynes v. Grimes Packing Co., 337 U.S. 86, at page 122, 69 S.Ct. 968, at page 988, 93 L.Ed. 1231:

> "As § 208.23(r) with its exception in favor of the natives in possession of Karluk Reservation and their licensees is based upon § 1 of the White Act, we think it clear that its proviso 'that no exclusive or several right of fishery shall be granted therein,' applies to commercial fishing by natives equally with fishing companies, nonresidents of Alaska or other American citizens and so applies whether those natives are or are not residents on a reservation. We find nothing in the White Act that authorizes the Secretary of the Interior to grant reservation occupants the privilege of exclusive commercial fishing rights. * * * The White Act fishing preserves were not intended to furnish a monopoly to a favored few. * * *"

There are many cases besides those which I have mentioned which have been cited by counsel in their briefs and arguments which support the conclusions here reached, that the Secretary of the Interior is without authority to except the fish traps of the plaintiffs from his Order dated March 7, 1959, 24 Fed.Reg. 2053–71, prohibiting the use of fish traps in Alaskan waters effective April 18, 1959; and that the State of Alaska has authority to prohibit all fish traps in Alaskan waters, including those of the plaintiffs, and the plaintiffs are not entitled to the relief here sought.

Findings of Fact, if desired, may be presented, together with Judgment and Decree in accordance with this opinion.