*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0294p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

OTTAWA TRIBE OF OKLAHOMA,
　　　　　　　　　*Plaintiff-Appellant,*

　　*v.*

SEAN LOGAN, DIRECTOR, OHIO DEPARTMENT
OF NATURAL RESOURCES,
　　　　　　　　　*Defendant-Appellee.*

No. 08-3621

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 05-07272—Jack Zouhary, District Judge.

Argued: March 5, 2009

Decided and Filed: August 18, 2009

Before: KENNEDY, NORRIS, and COLE, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Matthew C. Blickensderfer, FROST BROWN TODD LLC, Cincinnati, Ohio, for Appellant. Sharon A. Jennings, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Matthew C. Blickensderfer, FROST BROWN TODD LLC, Cincinnati, Ohio, Richard D. Rogovin, FROST BROWN TODD LLC, Columbus, Ohio, for Appellant. Sharon A. Jennings, Damian W. Sikora, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

　　NORRIS, J., delivered the opinion of the court, in which KENNEDY, J., joined. COLE, J. (pp. 10-11), delivered a separate concurring opinion.

———————————

**OPINION**

———————————

　　ALAN E. NORRIS, Circuit Judge. In this action for a declaratory judgment, the Ottawa Tribe of Oklahoma ("the Tribe") seeks to establish that, under various treaties, it retains the right to fish in Lake Erie, and that the state of Ohio, through the Director of the

1

Ohio Department of Natural Resources, defendant Sean Logan ("the State"), lacks the authority to regulate this activity.  We hold that, because the Tribe, under these treaties, retained at most a right of occupancy to the lands in Ohio, and this right was extinguished upon abandonment, any related fishing rights it may have reserved were similarly extinguished when the Tribe removed west of the Mississippi.  We therefore affirm the judgment of the district court.

## I.

The facts of this case are a matter of historical record.  The Tribe, through a series of treaties executed during the late 18th and early 19th centuries, was displaced from northern Ohio to Kansas and then later to Oklahoma, where its members currently reside.  Invoking several of these treaties, the Tribe now seeks to begin a commercial fishing enterprise on Lake Erie.  The Tribe's claim that it has the right to operate this enterprise without regard to Ohio's commercial fishing regulations, and the state's rejection of that claim, resulted in this lawsuit.

The treaties at issue in this case are several–but not all–of those by which the United States, over a period of several decades, dealt with the Tribe and ultimately removed it from northern Ohio.  They are: (1) the Treaty of Greenville, Aug. 3, 1795, 7 Stat. 49 (hereinafter "Treaty of Greenville"); (2) the Treaty of Fort Industry, which actually consists of two separate treaties: the Connecticut Land Company Treaty, July 4, 1805, Gales & Seaton, 1 American State Papers: Indian Affairs 696 (1832), *available at* http://earlytreaties.unl.edu/treaty.00044.html (hereinafter "CLC Treaty"), and the United States Treaty, July 4, 1805, 7 Stat. 87 (hereinafter "U.S. Treaty"); (3) the Treaty of Detroit, Nov. 17, 1807, 7 Stat. 105 (hereinafter "Treaty of Detroit"); (4) the Treaty of Maumee Rapids, Art. 1, Sept 29, 1817, 7 Stat. 160 (hereinafter "Treaty of Maumee Rapids"); and (5) the Treaty of 1831, Aug. 30, 1831, 7 Stat. 359 (hereinafter "Treaty of 1831").  We briefly summarize those treaties.

By the Treaty of Greenville, which brought to an end a conflict between the United States and a number of Indian[1] tribes residing in Ohio and Indiana, the tribes ceded to the United States more than one half of the present state of Ohio. Under the treaty, the United States "relinquish[ed] their claims to all other Indian lands" (with a few irrelevant exceptions) in Ohio. Treaty of Greenville arts. 3 & 4. The eastern boundary of the Indian territory began at the mouth of the Cuyahoga River on Lake Erie, and generally ran south to the site of Fort Laurens, for just over 70 miles. The southern border of the lands reserved to the tribes began there and runs west-southwest into modern-day Indiana. To the northwest of this boundary was the land to which the United States relinquished its claims, which in Ohio consisted largely of Royce Areas[2] 53, 54, 66, 87, 88, 99, and all of the smaller Royce Areas encompassed in them. *See* Charles C. Royce, Indian Land Cessions in the United States, Royce Map of Ohio, *reprinted in* II 18th Annual Report of the Bureau of American Ethnology–1896-97 (1899) (hereinafter "Royce, Land Cessions"). The treaty is silent as to any northern border for the land to which the United States relinquished its claims, and the parties dispute whether the Indian lands encompassed part of Lake Erie.

The Indian tribes later ceded some of the land relinquished to them by the Greenville Treaty in the Treaty of Fort Industry, which, as noted above, actually is comprised of two treaties: the CLC Treaty and the U.S. Treaty, both signed on July 4, 1805. The CLC Treaty conveyed Royce Area 53 to the Connecticut Land Company, and the U.S. Treaty similarly conveyed Royce Area 54 to the United States. CLC Treaty; U.S. Treaty art. II. Taken together, these treaties ceded away all of the land the Indian tribes had retained under the Treaty of Greenville to the east of a line running north and south drawn 120 miles west of the Pennsylvania border. The Tribe does not argue that either of these treaties *created* fishing rights in Lake Erie, but instead contends that they "did not extinguish the Ottawas' fishing rights reserved under the Treaty of Greenville."

---

[1] We recognize that the word "Indian," when used to describe the members of the Ottawa and other Native American tribes, may seem to some people an offensive term. However, the parties to this dispute both employ this term, as do the historical materials at issue here, and so we feel comfortable that our use of it in this opinion will not be interpreted as a slight to the people who inhabited this land before the arrival of European settlers.

[2] The areas referred to as "Royce areas" throughout this opinion are so named after Charles C. Royce, who created complete maps of the distinct pieces of land relinquished by the Indians to the United States in each respective treaty. Each "Royce Area" on a "Royce Map" corresponds to a distinct parcel of land ceded to the United States in a distinct treaty. *See* Appendix A.

At this point various Indian tribes, including the Ottawa, still retained possession of a significant portion of Ohio, but the expansion of our young republic was to continue at the expense of the tribes. In the Treaty of Detroit, signed in 1807, the Indian tribes ceded Royce Area 66 to the United States. The portion of Royce Area 66 lying in Ohio was a relatively small right triangle of land, bordered on the north (for our purposes) by the Michigan-Ohio border, on the west by a line running directly north from the mouth of the Auglaize River to the border of Michigan, and on the southeast hypotenuse by the middle of the Maumee River,[3] from its mouth on Lake Erie upriver to the mouth of the Auglaize River. Treaty of Detroit art. I. The legal description used in the conveyance included a portion of Lake Erie bordering the present state of Michigan, but not Ohio. The treaty further provided that "[i]t is further agreed and stipulated, that the said Indian nations shall enjoy the privilege of hunting and fishing on the lands ceded as aforesaid, as long as they remain the property of the United States." Treaty of Detroit art. V. The Tribe argues that this is evidence both that it retained fishing rights to Lake Erie in the Treaty of Greenville, and also that it continued to retain these rights in the Treaty of Detroit.

Ten years later, in 1817, the Wyandot Indian tribe ceded Royce Area 87 to the United States through the Treaty of Maumee Rapids, bringing U.S. ownership of the modern-day state of Ohio nearly to completion. Royce Area 87 includes most of the Indian territory in Ohio lying west of Royce Areas 53 and 54, and south of the Miami River.[4] Six other tribes, including the Ottawas, "accede[d]" to the cession. Treaty of Maumee Rapids, art. 3. Also by the treaty, the Ottawa, Pottawatomie, and Chippewa tribes ceded to the United States Royce Area 88, a conveyance not at issue in this appeal.

Finally, in the Treaty of 1831, the United States purchased the small tracts of land reserved to the Ottawas in the Treaties of Detroit and Maumee Rapids. Treaty of 1831, preamble. In addition, members of the Tribe living on those tracts agreed "to remove west of the Mississippi" river. The Treaty of 1831 was the first removal treaty entered into

---

[3] In the early 19th century this river was known also as the "Miami River" or "Miami of the Lake," and is referred to as such in several treaties, including the Treaty of Detroit. Treaty of Detroit art. I. These names are interchangeable and so we use the modern nomenclature for clarity.

[4] The Treaties of Maumee Rapids and Detroit each left the Indians with some very small portions of land encompassed by Royce Areas 66 and 87. However, because the tribes subsequently entered into removal treaties from the entire area, these minor reservations are not relevant to our analysis in this case.

between the United States and the Ottawa tribe, and effectively removed the Tribe from Ohio, leaving only a handful of Ottawas on some small plots of land. More removal treaties followed, and by the end of the decade, the Ottawas had conveyed all of their lands in Ohio to the United States. Although a few Ottawas remained in Ohio for some time, to our knowledge all of them eventually departed, and the Tribe does not suggest otherwise. By 1839, the main tribal organization had transferred to Kansas. The Tribe argues that, even though it was effectively removed from Ohio by the Treaty of 1831, the treaty's language was insufficiently explicit to extinguish the fishing rights the Indians retained under the Treaty of Detroit. Moreover, because the Treaty of 1831 expressly limits itself to purchasing rights established in the Treaties of Detroit and Maumee Rapids, it has no effect on the fishing rights established in the Treaty of Greenville.

Relying on the treaties described above, the Tribe brought suit in the district court against the State, seeking a declaratory judgment that, among other things,[5] the Tribe could carry out its plan to fish commercially in Lake Erie, with only minimal regulatory intrusion by the State. The State first moved to dismiss based on its interpretation of the treaties discussed above, and the district court denied this motion. The State then moved for summary judgment based on laches. The district court requested supplemental briefing on interpretation of the relevant treaties, and the parties complied. The district court granted the State's motion for summary judgment based on laches for all claims except that regarding fishing rights on Lake Erie. For that claim, it granted summary judgment to the State based on its interpretation of the above treaties. *Id.* at 14-23. The Tribe appeals only the latter decision.

## II.

We review a district court's decision granting a motion for summary judgment de novo. *Keweenaw Bay Indian Cmty. v. Naftaly*, 452 F.3d 514, 521 (6th Cir. 2006).

---

[5]Not at issue here are the Tribe's additional requests for declaratory judgment regarding their alleged rights to hunt in Ohio and fish in its inland waterways, also without being subject to regulation by the state of Ohio. The Tribe does not challenge the district court's ruling on those issues, and so we do not review that decision.

We also stress that, although this case raises a host of difficult issues of first impression in this circuit–and the country–we seek to decide this case on the narrowest possible grounds and express no opinion as to any issues except those which are discussed below.

This is a deceptively straightforward case. There are numerous treaties at issue here, but essentially, under the Treaty of Greenville the United States acquired Indian lands south of the treaty's east-west line and relinquished its claims to Indian lands north of the line. By the remaining treaties at issue here the Ottawas and other Indian tribes ceded that land to the United States in a piecemeal fashion. The gist of the Tribe's argument is that under the Treaty of Greenville, it reserved fishing rights to the Lake, and none of the subsequent treaties ceded away those rights. The Treaty of Greenville is therefore the keystone of the Tribe's position in this case, without which the remainder of its arguments collapse.

The United States Supreme Court has had occasion to explain its view of the Treaty of Greenville with some precision. In *Williams v. City of Chicago,* 242 U.S. 434 (1917), the Court addressed a claim by the Pottawatomie Tribe that, pursuant to several treaties between itself and the United States, it owned a portion of land within the city of Chicago. The Pottawatomies, like the Ottawas, had initially resided on land in this area reserved to them in the Treaty of Greenville, but through a series of subsequent treaties had ceded that land to the United States. *Id.* at 436. The Pottawatomie's claim proceeded on the theory that it had never conveyed to the United States its interest in the lakebed of Lake Michigan, so that when a portion of the lakebed was filled in in order to expand downtown Chicago, that filled-in portion of the lake still belonged to the Indians. *Id.* They sought to exercise their claimed rights by either excluding non-Indians from the landfilled areas, or selling the land to the United States. *Id.* at 436-37. The Court offered this brief and apposite analysis:

> By the Treaty of Greenville the United States stipulated with the Pottawatomies and other Indians that generally in respect of a large territory westward of a line passing through Ohio, "The Indian tribes who have a right to those lands, are quietly to enjoy them, hunting, planting, and dwelling thereon so long as they please, without any molestation from the United States; but when those tribes, or any of them, shall be disposed to sell their lands, or any part of them, they are to be sold only to the United States; and until such sale, the United States will protect all the said Indian tribes in the quiet enjoyment of their lands against all citizens of the United States, and against all other white persons who intrude upon the same." We think it entirely clear that this treaty did not convey a fee simple title to the Indians; that under it no tribe could claim more than the right of continued occupancy; and that when this was abandoned all legal right or interest which both tribe and its members had in the territory came to an end.

*Id.* at 437-38.

It seems to us that *Williams* narrows our inquiry by placing two propositions beyond dispute: (1) the Indian tribes retained only a right of continued occupancy to territories reserved to them under the Treaty of Greenville, and (2) in the event that the tribes abandoned the territory, "all legal right or interest" they had to it is extinguished. In the case at bar, the Tribe concedes that it is bound by the first proposition: under the Treaty of Greenville it had only a right of occupancy to the lands of northwestern Ohio. In addition, the Tribe does not dispute that it abandoned northwestern Ohio when it was removed west of the Mississippi via the Treaty of 1831. Its claim, therefore, rests on demonstrating that its alleged fishing rights somehow survive, despite the *Williams* Court having ruled that, upon abandonment, "all legal right or interest which both the tribe and its members had in the territory came to an end." *Id.* at 438.

The Tribe attempts to do so by distinguishing between the fishing rights it seeks to exercise here, and the "land claim" at issue in *Williams*. But the Tribe suggests no reason why this difference matters, and we can see none. Whether one views fishing rights as either subsumed into the general right of occupancy, or instead as a stand-alone stick in the proverbial bundle of title, those rights were extinguished along with the right of occupancy when the Tribe abandoned the territory. If fishing rights are merely a feature of the larger right of occupancy, they would be extinguished upon abandonment along with the right of occupancy. *Cf. Williams*, 242 U.S. at 438. But even if we were to assume, for the sake of argument, that the fishing rights stand on their own as some kind of independent property right, we would nevertheless be compelled to conclude that, if abandonment extinguished rights to land that the Treaty of Greenville *specifically* granted to the tribes, then so would it extinguish alleged fishing rights that are not mentioned in the treaty at all. Moreover, the right to fish is merely the kind of "legal right or interest" examined by the Supreme Court in *Williams*; they too "came to an end" when the Tribe relocated to Kansas.

All of the subsequent treaties relevant to this case regarded land to which the tribes held the right of continued occupancy under the Treaty of Greenville. In each treaty, the Tribe ceded more and more land to the United States, in exchange for monetary compensation and the exception of occasional reservations of smaller portions of land. None of these treaties granted the Tribe stronger property rights than it had held previously. Accordingly, we conclude that, whatever fishing rights the Tribe may have retained under

the Treaties of of Fort Industry, Detroit, Maumee Rapids, and 1831, those rights were the same as, or lesser than, the rights it retained under the Treaty of Greenville, and therefore, applying the *Williams* rationale, were extinguished when the Tribe abandoned the land and removed west of the Mississippi.[6,7]  *Id.*

### III.

The judgment of the district court is therefore **affirmed**.

---

[6] Abandonment is not to be confused with laches, an issue we decline to address today. Abandonment of rights stems from a physical removal from the area where those rights were exercised, with no expectation of exercising the rights again, as occurred here as well as in *Williams*. Laches arises from an extended failure to exercise a right to the detriment of another party, and we express no opinion as to whether laches could apply to defeat the rights at issue here.

[7] Although it does not bear on our decision, we also note in passing that victory for the Tribe in its fishing rights claim could have implications beyond rights to fish on Lake Erie. At oral argument counsel for the Tribe acknowledged that, should it prevail, the Tribe could conceivably seek to prevent private parties, both commercial and noncommercial, from interfering with its fishing rights, by enjoining them from fishing Lake Erie, seeking to abrogate commercial fishing deeds to portions of the Lake, or even requiring private parties to remove physical items, such as docks, from the lake. Furthermore, counsel also acknowledged that prevailing in this case could open the door to claims broader than fishing rights, such as a right to mine the significant salt deposits lying beneath the lakebed of Lake Erie.

**APPENDIX A**



—————————————

**CONCURRENCE**

—————————————

COLE, Circuit Judge, concurring.   Today we apply the *Williams* rationale and conclude that whatever fishing rights the Tribe retained under the Treaty of Greenville were extinguished when the Tribe abandoned northwestern Ohio.  I write separately only to express my view that the *Williams* decision need not have been dispositive had the Tribe provided sufficient evidence to raise a genuine issue of material fact as to the nature of the Tribe's usufructuary rights, i.e., hunting, fishing and gathering rights.  The *Williams Court* held that the Treaty of Greenville only "conveyed to the tribes a right of continued occupancy to the lands located in the treaty-reserved territories and that all legal right or interest the tribe had in the land came to an end when it abandoned the territory." *Williams v. City of Chicago*, 242 U.S. 434, 438 (1917).  The majority reasons that under *Williams*, whatever the nature of  the Tribe's fishing rights, those rights were extinguished when occupancy ended.  I, however, am not convinced that we are fully bound by *Williams* in all cases dealing with usufructuary rights under the Treaty of Greenville. To the extent that our decision may be read to advance that proposition, I disagree.

I am not persuaded that *Williams* compels the conclusion that regardless of the nature of the Tribe's fishing rights, all of the Tribe's usufructuary rights were automatically abrogated when the Tribe abandoned the territory.  Supreme Court precedent explains that treaty-reserved non-exclusive rights of use are not dependent on title or the right of occupancy. *See Kennedy v. Becker*, 241 U.S. 556, 562 (1916); *United States v. Winans*, 198 U.S. 371, 381 (1905).  Therefore, usufructuary rights may exist even where a tribe no longer has the right to occupy the land associated with those rights. *See Minn. v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 201-202 (1999) (holding that tribe held nonexclusive-usufructuary rights, which were not linked to land ownership, were not extinguished when the tribe ceded the land on which those rights were associated).  To determine whether the Greenville Treaty language abrogates the Tribe's usufructuary rights when their occupancy ended, the Supreme Court instructs us "to look beyond the written words of the Treaty to the larger context that frames the Treaty, including 'the history of the treaty, the negotiations, and the practical construction adopted by the parties.'" *Minn.*, 526 U.S. at 196 (quoting

*Choctaw Nation v. United States*, 318 U.S. 423, 432 (1943) and citing *El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng*, 525 U.S. 155, 167 (1999)).  We must also interpret treaty terms as the Tribe would have understood them.  *Id*.

Here, we could have, as the Tribe argued, distinguished *Williams* because there the Court did not conduct an inquiry into each Indian tribe's understanding of the Treaty's terms when reaching its decision.  In particular, the *Williams* Court did not analyze the historical record and the parties' understanding of fishing rights.  So, even if the *Williams* Court found that the Pottawatomie Tribe's usufructuary rights were inextricably linked to their right of occupancy, and that such rights were abrogated when the Pottawatomie Tribe left the territory, we could have reached the opposite conclusion with respect to the Tribe.  It is conceivable that, based on the Tribe's understanding of the Greenville Treaty and the historical record, their understanding of the Treaty language differed from the Pottawatomie Tribe's.  But that leaves a question before us: does the historical record suggest that the Tribe's fishing rights were a distinct bundle of rights separate from its right to occupy the land associated with those rights.  If the Tribe's fishing rights were a separate bundle of property rights, we would not be bound by *Williams*.

However, we cannot reach this issue because the historical record provided by the parties includes scant evidence of the Tribe's understanding of the Treaty terms or usufructuary rights.  We have some evidence that some Tribe members were reluctant to leave the territory, and that some may have remained in Ohio for a time after the majority of the Tribe left the area.  (ROA Vol. 1, pp. 456-57; 459; 464-65.)  There is also evidence that the remaining Tribe members continued to hunt on land ceded by treaty.  (ROA Vol. 1, p. 465.)  But none of this evidence touches upon the Tribe's fishing rights, nor does the Tribe make any effort to make a connection between this evidence and the Tribe's understanding of their usufructuary rights.  Further, none of the expert evidence examines the Tribe's understanding of the Tribe's fishing rights in relation to the their right to occupy the ceded land.  Given this dearth of evidence, it is impossible to parse the Tribe's right to occupancy from their usufructuary rights, or to raise a genuine issue of material fact on the issue.  Thus, I believe, on the record before us, we are bound by *Williams*.