[No. 43736. En Banc. April 8, 1976.]

THE DEPARTMENT OF GAME, ET AL, *Respondents*, v.
PUYALLUP TRIBE, INC., ET AL, *Appellants*.

*Stan Pitkin, United States Attorney; Harry J. McCarthy, Assistant Attorney of the United States; George D. Dysart, Assistant Regional Solicitor;* and *William H. Rodgers, Jr.,* for appellant Puyallup Tribe, Inc.

*John Sennhauser,* for appellant Bennett.

*Slade Gorton, Attorney General,* and *Edward B. Mackie, Deputy,* for respondent State.

*Willner, Bennett, Riggs & Skarstad,* by *Don S. Willner,* and *Riddell, Williams, Ivie, Bullitt & Walkinshaw,* by *Vincent R. Larson,* for respondents Northwest Steelheaders, et al.

HUNTER, J.—The appellants (defendants), the Puyallup Tribe and Ramona Bennett, the Tribal Council chairwoman,[1] appeal from a decision of the Superior Court for Pierce County, which determined the extent of their right to commercially fish for steelhead. The Washington State Department of Game has also appealed from certain aspects of the trial court's decision.

This case does not involve a conflict of recent origin. Rather, the initial litigation commenced in 1963. Since that time, we have written two decisions, both of which have been reviewed by the United States Supreme Court. In order to place the present case in proper perspective, we shall initially set forth the nature of the issues previously raised and the decisions rendered.

In *Department of Game v. Puyallup Tribe, Inc.*, 70 Wn.2d 245, 422 P.2d 754 (1967), we recognized that the Puyallup Tribe still existed and that its members enjoyed certain fishing rights under the Treaty of Medicine Creek. Furthermore, we held that these rights could only be limited through statute or regulations to the extent reasonably necessary for the conservation of the fishery. On review, the United States Supreme Court affirmed our decision. It held that while the rights secured by the treaty extended to off-reservation fishing, nevertheless "the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 398, 20 L. Ed. 2d 689, 88 S. Ct. 1725 (1967) (hereinafter cited as *Puyallup I*). However, that court remanded the case for a determination of the issue of whether the total bar against

---

[1] As we have pointed out twice before, "[t]he case caption is erroneous, there being no entity known as 'The Puyallup Tribe, Inc., a corporation.' The Puyallup Tribe of Indians did appear and answer by and through the chairman of the Tribal Council." *Department of Game v. Puyallup Tribe, Inc.*, 70 Wn.2d 245, 247 n.1, 422 P.2d 754 (1967), *quoted in Department of Game v. Puyallup Tribe, Inc.*, 80 Wn.2d 561, 563 n.1, 497 P.2d 171 (1972).

the use of set nets in freshwater streams or at their mouths was a reasonable and necessary conservation measure. In response to this decision, the Department of Fisheries, charged with the duty of regulating the salmon fishery, changed its regulations to allow a net fishery for salmon in those areas of the Puyallup River not utilized for spawning.

On the other hand, the Department of Game, which is the governing agency with regard to steelhead, refused to pass a similar regulation and continued to prohibit all net fishing for steelhead trout. In an appeal to this court, we held that the regulations passed by the Department of Fisheries were reasonable and consistent with the necessary conservation standards. *Department of Game v. Puyallup Tribe, Inc.*, 80 Wn.2d 561, 497 P.2d 171 (1972). In regard to steelhead, we stated that while the Indians may have a right to a net fishery, nevertheless the steelhead run was not of sufficient size to withstand a commercial net fishery for that year. On review, the United States Supreme Court held that a total ban of net fishing would discriminate against the Indians, since the steelhead fishery was totally preempted by the hook and line, non-Indian sport fishermen. *Department of Game v. Puyallup Tribe*, 414 U.S. 44, 38 L. Ed. 2d 254, 94 S. Ct. 330 (1973) (hereinafter cited as *Puyallup II*). That court remanded the case for a determination of the percentage of the run which had to be allowed to escape in order to perpetuate the species, and the number of catchable fish which had to be apportioned to an Indian commercial net fishery. In a concurring opinion, three Justices noted that the majority opinion applied only to the natural run of steelhead.

On remand, the Superior Court for Pierce County held that the fishing rights afforded under the treaty did not extend to the hatchery run, that one-half of the natural run had to be allowed to escape in order to perpetuate the species, and that the Indians were entitled to catch 45 percent of the remaining one-half of the natural run. The Puyallup Tribe has appealed from the trial court's decision in its entirety. The State Department of Game has appealed

from that portion of the decision which determined the size of the total natural run and the apportionment of 45 percent of the catchable fish to the tribe.

At the outset it seems appropriate to discuss the jurisdictional aspects of this case. Appellants have contended all along that the state courts do not have jurisdiction in this matter because issues pertaining to federal treaty rights are exclusively federal matters. We believe this contention is without merit for two reasons. First, in this case the State is concerned with a matter that is clearly within its jurisdiction—it is seeking to determine the extent to which it can apply its sovereign power to regulate resources for the purpose of conservation. *See Puyallup I* at 398-400. In order to do so, it is necessary to determine the extent to which Indians may be exempt from state regulations because of overriding federal treaty rights. *See State ex rel. Campbell v. Case*, 182 Wash. 334, 341, 47 P.2d 24 (1935). In this posture, the case is analogous to "a suit to enjoin violations of state law by individual tribal members fishing off the reservation," a situation clearly within state jurisdiction. *See Puyallup I* at 397 n.11.

Second, and more importantly, jurisdiction is proper because the United States Supreme Court specifically remanded this case for a determination of a fair allocation that "accommodate[s] the rights of Indians under the Treaty and the rights of other people." *See Puyallup II* at 49. We view *Puyallup II* as expressly conferring jurisdiction in this matter in the state courts.

It has also been contended that the recently established, continuing existence of the Puyallup Indian Reservation, *see United States v. Washington*, 496 F.2d 620 (9th Cir. 1974), *cert. denied*, 419 U.S. 1032 (1974), precludes any state jurisdiction over activities occurring within the reservation boundaries. We believe that this is at most simply not the case, and at least an open question after *Mattz v. Arnett*, 412 U.S. 481, 485, 37 L. Ed. 2d 92, 93 S. Ct. 2245 (1972). In addition, the Supreme Court's clear mandate in *Puyallup II* would seem to include on-reserva-

tion state jurisdiction. In order to control the escapement necessary for the conservation of the species, it is inescapable, given the geography in this case, that the State must be able to control on-reservation fishing activities. State regulation of on-reservation fishing is mandated by, and consistent with, the Supreme Court's view of Indian treaty rights as presented in *Puyallup II* at page 49:

We do not imply that these fishing rights persist down to the very last steelhead in the river. Rights can be controlled by the need to conserve a species; and the time may come when the life of a steelhead is so precarious in a particular stream that all fishing should be banned until the species regains assurance of survival. The police power of the State is adequate to prevent the steelhead from following the fate of the passenger pigeon; and the Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets.

Finally, any suggestion that this court should defer to the United States District Court of Western Washington, in light of its continuing jurisdiction in a similar fishing matter, on grounds of comity, is not well taken. The present case was remanded by the Supreme Court to the state courts before that federal action was even started. There is no reason we should defer to the subsequently commenced, ongoing litigation in that federal court.

Therefore, we conclude that our jurisdiction is proper. Furthermore, as will be indicated later in the opinion, continuing jurisdiction over the Indians' steelhead fishery must be exercised by the State Department of Game.

Before considering the issues raised by the appellants and cross-appellants, an analysis of the United States Supreme Court's decision in *Puyallup II* is essential. Reading *Puyallup II* in context with *Puyallup I*, we feel that the issue of whether the Treaty of Medicine Creek gives the Indians a right to a commercial net fishery is at least an open question. In *Puyallup II*, the United States Supreme Court stated on page 48: "Our prior decision recognized that net fishing by these Indians for commercial purposes

was covered by the Treaty. 391 U.S., at 398-399." However, as demonstrated below, the language of *Puyallup I* does not bear this out. In *Puyallup I*, the United States Supreme Court made the following statement on page 398:

> The treaty right is in terms the right to fish "at all usual and accustomed places." We assume that fishing by nets was customary at the time of the Treaty; and we also assume that there were commercial aspects to that fishing as there are at present. But the *manner* in which the fishing may be done and its purpose, whether or not commercial, are not mentioned in the Treaty. We would have quite a different case if the Treaty had preserved the right to fish at the "usual and accustomed places" *in the "usual and accustomed" manner*. But the Treaty is silent as to the mode or modes of fishing that are guaranteed. Moreover, the right to fish at those respective places is not an exclusive one. Rather, it is one "in common with all citizens of the Territory." Certainly the right of the latter may be regulated. And we see no reason why the right of the Indians may not also be regulated by an appropriate exercise of the police power of the State. The right to fish "at all usual and accustomed" places may, of course, not be qualified by the State, even though all Indians born in the United States are now citizens of the United States. Act of June 2, 1924, 43 Stat. 253, as superseded by § 201(b) of the Nationality Act of 1940, 8 U. S. C. § 1401(a)(2). But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians.

In the final paragraph of the *Puyallup I* opinion, the Supreme Court drew the following conclusion on pages 401-03:

> Whether the prohibition of the use of set nets in these fresh waters was a "reasonable and necessary" (70 Wash. 2d, at 261, 422 P.2d, at 764) conservation measure was left for determination by the trial court when the Supreme Court, deeming the injunction in No. 247 too broad, remanded the case for further findings. When the case was argued here, much was said about the *pros* and the *cons* of that issue. Since the state court has given us no authoritative answer to the question, we leave it un-

answered and only add that any ultimate findings on the conservation issue must also cover the issue of equal protection implicit in the phrase "in common with."

(Footnotes omitted.) Therefore, it certainly appears that the United States Supreme Court in *Puyallup I* declined to interpret the Medicine Creek Treaty with regard to the Indians' right to a net fishery. We recognized this in our second decision, *Department of Game v. Puyallup Tribe, Inc.*, 80 Wn.2d 561, 497 P.2d 171 (1972), when we stated on page 568:

> [T]here can no longer be any question that *whatever the United States Supreme Court may ultimately construe to be the Indian rights to fish under the Medicine Creek Treaty*, they are subject to the reach of the state powers and regulations necessary to the conservation of the fishery, providing the regulations are not discriminatory against the Indians.

(Italics ours.)

 In addition, it is important to place our decision in the above case in the correct perspective. The controlling issue there was the validity of regulations enacted by the Department of Fisheries and the Department of Game. The Department of Fisheries' regulations allowed an Indian net fishery in the Puyallup River for salmon, subject to certain limitations for conservation purposes. The Department of Game regulations prohibited a net fishery for steelhead. Our decision was designed to determine the reasonableness of regulations and not to interpret the treaty itself. It was unnecessary to decide whether the Department of Game was *required* to pass a regulation allowing a net fishery for steelhead. Consequently, we overstated our case by indicating that an Indian net fishery was a matter of right under the treaty. To the extent that our decision lends itself to this interpretation, it is hereby overruled.

Considering the present appeal in this posture, we now direct our analysis to the interpretation of the Treaty of Medicine Creek that we deem to be correct. We feel that an interpretation is necessary as an initial matter in order to

arrive at an allocation of steelhead in the Puyallup River that is consistent with and takes into account Indian rights under the treaty. Those rights must be determined before they can be given effect.

If the Treaty of Medicine Creek, December 26, 1854 (10 Stat. 1132), provides the Puyallup Indians with any fishing right at all beyond those possessed by ordinary citizens, the provision that does so is article 3 (10 Stat. 1133). *See Puyallup I* at 394-95 n.1. The pertinent language of article 3 is the following:

> *The right of taking fish,* at all usual and accustomed grounds and stations, is further secured to said Indians, *in common with all citizens of the Territory* . . .

(Italics ours.) It is the interpretation of this treaty language that is crucial to any determination of Indian fishing rights. As with any Indian treaty, of course, certain long-standing and often stated rules of construction govern this very significant interpretation.

 The rules of interpretation applicable to Indian treaties have been variously stated. Basically, treaties are to be interpreted in accord with the intent of the parties. So far as possible, the sense in which the Indians under-stood the treaties rather than a technical legal meaning should be given effect. *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631, 25 L. Ed. 2d 615, 90 S. Ct. 1328 (1970); *Choctaw Nation of Indians v. United States*, 318 U.S. 423, 432, 87 L. Ed. 877, 63 S. Ct. 672 (1943); *United States v. Shoshone Tribe*, 304 U.S. 111, 116, 82 L. Ed. 1213, 58 S. Ct. 794 (1938); *Starr v. Long Jim*, 227 U.S. 613, 623, 57 L. Ed. 670, 33 S. Ct. 358 (1913), quoting *Jones v. Meehan*, 175 U.S. 1, 11, 44 L. Ed. 49, 20 S. Ct. 1 (1899); *United States v. Winans*, 198 U.S. 371, 49 L. Ed. 1089, 25 S. Ct. 662 (1905); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 581, 8 L. Ed. 483 (1832). The United States Supreme Court stated this principle in *Tulee v. Washington*, 315 U.S. 681, 684, 86 L. Ed. 1115, 62 S. Ct. 862 (1942), as follows:

> It is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the

meaning they were understood to have by the tribal representatives at the council, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.

Another recognized rule of construction requires that the language in treaties and statutes ratifying agreements with the Indians be construed liberally in favor of the Indians and never to their prejudice. *Antoine v. Washington*, 420 U.S. 194, 199, 43 L. Ed. 2d 129, 95 S. Ct. 944 (1975); *Choctaw Nation of Indians v. United States, supra* at 431; *Worcester v. Georgia, supra.* Likewise, any ambiguities or "doubtful expressions" are to be resolved in favor of the Indians. *McClanahan v. Arizona Tax Comm'n*, 411 U.S. 164, 174, 36 L. Ed. 2d 129, 93 S. Ct. 1257 (1973), quoting *Carpenter v. Shaw*, 280 U.S. 363, 367, 74 L. Ed. 478, 50 S. Ct. 121 (1930); *Choctaw Nation v. Oklahoma, supra*; *Winters v. United States*, 207 U.S. 564, 576, 52 L. Ed. 340, 28 S. Ct. 207 (1908).

These canons of construction, however, are not without their limitations. With regard to the rule that resolves ambiguities in favor of the Indians, the United States Supreme Court recently stated in *DeCoteau v. District County Court*, 420 U.S. 425, 447, 43 L. Ed. 2d 300, 95 S. Ct. 1082 (1975), as follows:

> We give this rule the broadest possible scope, but it remains at base a canon for construing the complex treaties, statutes, and contracts which define the status of Indian tribes. *A canon of construction is not a license to disregard clear expressions of tribal and congressional intent.*

(Italics ours.) Similar limitations apply to all the liberal rules of construction mentioned above. First, the attempt as an initial matter, to prefer the Indians' understanding of a treaty does not mean that their alleged understanding *must* prevail. "[E]ven Indian treaties cannot be rewritten or expanded beyond their clear terms to remedy a claimed injustice or to achieve the asserted understanding of the parties." *Choctaw Nation of Indians v. United States, supra* at 432. *See Skokomish Indian Tribe v. France*, 320 F.2d 205,

207 (9th Cir. 1963). The United States Supreme Court has also stated that

> [w]e attempt to determine what the parties meant by the treaty. We stop short of varying its terms to meet alleged injustices. Such generosity, if any may be called for in the relations between the United States and the Indians, is for the Congress.

(Footnote omitted.) *Northwestern Bands of Shoshone Indians v. United States*, 324 U.S. 335, 353, 89 L. Ed. 985, 65 S. Ct. 690 (1945).

Second, the Supreme Court has said that it cannot "under the guise of interpretation, create presidential authority where there was none, nor rewrite congressional acts so as to make them mean something they obviously were not intended to mean." *Confederated Bands of Ute Indians v. United States*, 330 U.S. 169, 179, 91 L. Ed. 823, 67 S. Ct. 650 (1947). Indian rights cannot be determined "under any acceptable rule of interpretation" merely because the Indians thought the right existed. *Confederated Bands of Ute Indians v. United States*, *supra* at 180. Hence, if the language in an Indian treaty is clear and unambiguous, then the courts cannot interpret the treaty in a way that will expand or go beyond the rights that are plainly set out by the treaty.

As heretofore stated, the important language to be construed in article 3 of the Treaty of Medicine Creek is "[t]he right of taking fish . . . is further secured to said Indians, in common with all citizens of the Territory." The meaning of this clause is clear and unambiguous on its face. Its plain meaning has significance and confers a distinct benefit. However, interpretation of the treaty requires us to construe and give meaning to the phrase "in common with."

■■ The general meaning of "common" has changed very little since the Treaty of Medicine Creek was written. *Compare* N. Webster, *An American Dictionary of the English Language* 231 (1862), and *A Dictionary of American English* 575 (W. Craige ed. 1936) *with Webster's Third*

*New International Dictionary* (1961). The basic definition of "common" is not complicated. "Common" means "of or relating to a community at large (as a family unit, social group, tribe, political organization, or alliance) . . ." It therefore seems obvious that this treaty provision simply means that the Indians share in common, that is, share equally, with other citizens the opportunity to take fish. This treaty provision requires that as to their "accustomed grounds and stations" the Indians must not be denied the right to fish to the same extent as all other citizens of the state. State regulations governing fishing resources must treat Indians no better or worse than other citizens.

The United States Supreme Court seemed to recognize this interpretation when it said in the last paragraph of *Puyallup I*, on page 403, "that any ultimate findings on the conservation issue must also cover the issue of equal protection implicit in the phrase 'in common with.'" History also supports the view that the intent of the parties, as is clear from the provision's language, was to preserve equal treatment for the Indians.

There were absolutely no limitations on anyone, Indian or non-Indian, as to the steelhead or salmon harvest until the last part of the nineteenth century. *See Uncommon Controversy: Fishing Rights of the Muckleshoot, Puyallup, and Nisqually Indians* 61-62 (A Report Prepared for the American Friends Service Comm.) (U. W. Press 1970); Johnson, *The States Versus Indian off-Reservation Fishing: A United States Supreme Court Error*, 47 Wash. L. Rev. 207, 213-14 (1972).[2] This fact clearly indicates that at the time

---

[2]Up to 1921, the regulation of the fisheries that did occur was undertaken directly by the state legislature without technical help. The regulations reflected no more than a cursory knowledge of conservation requirements and consisted of limited time closures and increasingly stricter limitations on fixed gear. J. Crutchfield & G. Pontecorvo, *The Pacific Salmon Fisheries* 131-32 (1969). *See, e.g.*, Laws of 1899, ch. 117, §§ 1 and 2, p. 194-95; Laws of 1897, ch. 82, §§ 1-3, p. 214-16. *See also State v. Allen*, 80 Wash. 83, 141 P. 292 (1914).

The use of the most effective methods of catching fish, *e.g.*, fixed appliances such as fish traps and setnets, was not completely prohibited until 1935. Laws of 1935, ch. 1, § 8, p. 6. This prohibition was the result

of the treaty in 1854, the parties did not contemplate the event of conservation requirements necessary to preserve the species. There was an inexhaustible supply of fish, *see Uncommon Controversy, supra* at 4 n.3, 61-62, and the treaty was undoubtedly premised on this condition. Consequently, it is inconceivable that the parties to the treaty contemplated an allocation of the fish or an advantage of one over the other in the manner of taking fish. The fish were there for the taking. It was important only for the Indians to enjoy the right of taking fish in common with, *i.e.*, on an equal basis with, the citizens of the territory. This is exactly what the parties must have intended. It is what the language of article 3 plainly provides in addition to assuring the Indians access to certain geographical fishing areas.

Our interpretation of article 3 means that Indians under treaties concerning fishing rights "in common with all citizens" are, to the same extent as other citizens, subject to state conservation regulations that meet appropriate standards. *See Puyallup I* at 398-99. However, the Indians' treaty right to fish "at all usual and accustomed grounds and stations" cannot be qualified by the State. *See Antoine v. Washington, supra* at 206-07; *Puyallup I* at 398; *United States v. Winans, supra* at 381, 384. Thus the treaty language guarantees the Indians access to their usual and accustomed fishing grounds. This right of access cannot be contravened by the State even in the exercise of its police power for the conservation of fish as a natural resource. But the State can, for the purposes of conservation, properly regulate the public's right to fish and such regulations are applicable equally to Indians and non-Indians.

The United States Supreme Court's treatment of similar language in other Indian treaties is consistent with the above analysis. For instance, the court stated in *United*

---

not of legislative action but of an initiative measure which was approved at the general election on November 6, 1934. Moreover, it was not until 1947 that the steelhead species was classified as a game fish and thus became subject to the special regulations enforced by the Department of Game. *See* Laws of 1947, ch. 275, § 10, p. 1200.

*States v. Winans, supra* at 381, that the right of taking fish at all usual and accustomed places

was a right outside of those boundaries [the reservation] reserved "in common with the citizens of the Territory." As a mere right, it was not exclusive in the Indians. Citizens might share it, but the Indians were secured in its enjoyment by a special provision of means for its exercise.

The court further stated that this right does not "restrain the State unreasonably, if at all, in the regulation of the right. It only fixes in the land such easements as enables the right to be exercised." *United States v. Winans, supra* at 384.

Other Supreme Court treatments of this problem recognize more explicitly the equal regulation aspect. In *New York ex rel. Kennedy v. Becker*, 241 U.S. 556, 563, 60 L. Ed. 1166, 36 S. Ct. 705 (1916), which, as against Indians claiming a treaty right, upheld a state regulation prohibiting spear fishing, the Supreme Court justified the result as follows:

Rather are we of the opinion that the [treaty] clause is fully satisfied by considering it a reservation of a privilege of fishing and hunting *upon the granted lands* in common with the grantees, and others to whom the privilege might be extended, but subject nevertheless to that necessary power of appropriate regulation, *as to all those privileged*, which inhered in the sovereignty of the State

. . .

(Italics ours.)

In *Tulee v. Washington, supra* at 685, the Supreme Court held that a state regulation requiring license fees for fishing could not be applied to Indians because "such exaction of fees as a prerequisite to the enjoyment of fishing in the 'usual and accustomed places' cannot be reconciled with a fair construction of the treaty." However, the Supreme Court did clearly recognize the State's right to regulate for conservation when it stated earlier in the opinion on page 684, that

the treaty leaves the state with power to impose on Indians, equally with others, such restrictions of a purely

regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish . . .

(Footnote omitted.)

Further support for the interpretation presented above —that the Indians share equally, *i.e.*, in common with other citizens, the public right to fish and, in addition, are guaranteed access to certain fishing locations—is found in *Seufert Bros. Co. v. United States,* 249 U.S. 194, 63 L. Ed. 555, 39 S. Ct. 203 (1919). This case is particularly relevant because it involved article 3 of the Treaty with the Yakimas, June 9, 1855 (12 Stat. 951). That provision is nearly identical to article 3 of the Treaty of Medicine Creek. The two treaties were entered into contemporaneously. *See Seufert Bros. Co. v. United States, supra* at 196. The Supreme Court interpreted the treaty language as follows:

> How the Indians understood this proviso we are considering is not doubtful. During all the years since the treaty was signed they have been accustomed habitually to resort for fishing to the places to which the decree of the lower court applies, and they have shared such places with Indians of other tribes from the south side of the river and with white men. This shows clearly that their understanding of the treaty was that they had the right to resort to these fishing grounds and make use of them in common with other citizens of the United States,—and this is the extent of the right that is secured to them by the decree [injunction] we are asked to revise.

*Seufert Bros. Co. v. United States, supra* at 198-99. *See Puyallup I* at 399.

We conclude therefore that a proper interpretation of the Treaty of Medicine Creek permits the State to promulgate conservation regulations meeting appropriate standards that affect all citizens, Indian and non-Indian, equally. However, such regulations cannot deny the Indians access to their usual and accustomed fishing places, nor can they restrain Indian fishing at those places except to the extent the regulations restrain the fishing rights of all state citi-

zens, *e.g.*, regulations as to time and manner of fishing, size of catch, etc.

It should be noted that this interpretation of the treaty grants to the Indians certain rights that they otherwise would not clearly have retained at the time. In addition to guaranteeing access to certain fishing locations, article 3 of the treaty put them on an equal footing with "all citizens of the Territory." Admittedly, such equal treatment would be superfluous today—it would give the Indians no additional rights beyond those that they already possess. But at the time of the treaty, equal footing with citizens of the Territory was very significant. When the treaty was written Indians were not citizens and, in addition, some of the normal methods of obtaining citizenship were not open to them. *See Cohen's Handbook of Federal Indian Law* 154 (1971). Article 3 served a definite purpose because it assured the Indians that they would have a right to uninhibited access to their usual and accustomed fishing grounds. This guaranty was not unimportant in the context of a government policy designed to restrict the Indians to residence on the reservations as much as possible in order to avoid conflict between the Indians and the settlers. *See* E. Swindwell, *Report on Source, Nature, and Extent of the Fishing, Hunting and Miscellaneous Related Rights of Certain Indian Tribes in Washington and Oregon* 55, 58-59 (Department of the Interior, 1942); *Uncommon Controversy, supra* at 41-42; Coan, *The Adoption of the Reservation Policy in Pacific Northwest 1853-1855*, 23 Ore. Historical Q. 1, 12, 14 (1922). Consequently, the interpretation above, which means the Indians were assured equal treatment at the time of the treaty (plus the absolute right of access to certain locations), does not mean that the Indians were merely given something that they would have had even without the treaty. *Cf. United States v. Winans*, 198 U.S. 371, 380, 49 L. Ed. 1089, 25 S. Ct. 662 (1905).

Certain treaty rights may now be nugatory due to subsequent events. that is, they are now enjoyed by the Indians simply because they are citizens of the United States. This

does not mean, however, that a court in the context of interpretation can expand and rewrite a treaty beyond its clear meaning at the time it was entered into. *See Choctaw Nation of Indians v. United States*, 318 U.S. 423, 87 L. Ed. 877, 63 S. Ct. 672 (1943).

The Treaty of Medicine Creek clearly provided for significant rights at the time it was concluded. The treaty cannot now be expanded beyond its unambiguous terms even if some of those terms have been superseded, thus making the treaty arguably unjust. *See Northwestern Bands of Shoshone Indians v. United States*, 324 U.S. 335, 89 L. Ed. 985, 65 S. Ct. 690 (1945).

Because the treaty, as well as the equal protection guaranties to the Constitution, demands that the Indians receive equal treatment, it is uncontroverted that any state regulation of fishing may not discriminate, that is, the regulations must apply equally to all citizens whether Indian or non-Indian. *See Puyallup I* at 398, 403; *cf. New York ex rel. Kennedy v. Becker, supra* at 562. In the absence of an overriding federal treaty right granting the Indians a right to fish for steelhead trout with nets, state regulations allowing Indians to fish with nets while denying that manner of fishing to other citizens would be discriminatory and, hence, improper. *Cf. State ex rel. Campbell v. Case*, 182 Wash. 334, 341, 47 P.2d 24 (1935). Equal protection is denied when similarly situated persons, *e.g.*, all state citizens including Indians, are treated differently by allowing only a certain class to fish with nets. *See Truax v. Corrigan*, 257 U.S. 312, 334, 66 L. Ed. 254, 42 S. Ct. 124, 27 A.L.R. 375 (1921); *State ex rel. Bacich v. Huse*, 187 Wash. 75, 80, 59 P.2d 1101 (1936). Thus there would be no discrimination if all net fishing, including Indian net fishing, were prohibited. There is also no discrimination where all state citizens are only allowed to fish by a certain method, *e.g.*, by hook and line. Illegal discrimination would occur only where one group is given special rights that the other group is denied, *e.g.*, allowing only Indians to net fish or allowing only non-Indians to fish with hook and line. *See Thomson v.*

*Dana*, 52 F.2d 759, 764 (D. Ore. 1931), *aff'd per curiam*, 285 U.S. 529, 76 L. Ed. 925, 52 S. Ct. 409 (1932); *State v. Hals*, 90 Wash. 540, 542-43, 156 P. 395 (1916); *Barker v. State Fish Comm'n*, 88 Wash. 73, 76-77, 152 P. 537 (1915).

■ Therefore, in the absence of special federal rights, state regulations permitting only one group to utilize a certain fishing method would be discriminatory and in violation both of constitutional equal protection guaranties and the straightforward language of the Treaty of Medicine Creek. Consequently, we hold that the manner of fishing permitted by any regulation for the conservation of the fishery must apply the same to Indians as to non-Indians. For example, if the prohibition of net fishing is necessary for the preservation of the fishery, it must be equally applied both to Indians and non-Indians in order to come within the ambit of the equal protection clause of the United States Constitution and the "equal protection" implication of article 3 of the Treaty of Medicine Creek.

As previously mentioned, we feel that the juxtaposition of *Puyallup II* beside *Puyallup I* demonstrates that the interpretation of the Treaty of Medicine Creek is an open question. For this reason, we have rendered the decision above as the first phase of our opinion. We recognize that the ultimate disposition of the treaty interpretation question is, however, vested with the United States Supreme Court. Moreover, we feel constrained by the express language on the face of *Puyallup II*, when considered independent of *Puyallup I*, to defer to the statement in *Puyallup II*, recognizing an Indian right to a net fishery. Therefore, pending an ultimate disposition of this issue by the United States Supreme Court, we will follow *Puyallup II* and undertake a consideration of the allocation question expressly called for by that case. We must determine two issues. First, does the Indian treaty right to a net fishery encompass only the natural run of steelhead, or does it extend to both the natural run and the hatchery run? Second, in terms of number of fish, how extensive is the right, and by what agency should this allocation be implemented?

We shall address ourselves to these issues in the above order.

■■■ The artificial propagation of steelhead through a hatchery program on the Puyallup River did not commence until 1933. Therefore, just as the inexhaustible supply of fish at the time of the treaty makes it inconceivable that the parties contemplated controls and limits on the fishery, it is also inconceivable that either the tribe or the government intended the treaty to create any rights beyond the natural run. However, by examining the treaty itself, we do find evidence which specifically relates to this issue. Even though the treaty obviously makes no reference to artificially propagated steelhead, which were unknown at the time, it does set forth Indian rights with regard to artificially cultivated shellfish. There is an explicit proviso in article 3 that follows the language securing "the right of taking fish." The proviso states "[t]hat they [the Indians] shall not take shellfish from any beds staked or cultivated by citizens . . ." Treaty of Medicine Creek (10 Stat. 1132-33). This plain language demonstrates that the rights secured to the tribe under the treaty did not encompass artificially propagated sources of fish. Likewise, the Supreme Court indicated in *Puyallup II* that this result is correct. The majority opinion made no comment at all on the issue, but the concurring opinion of Mr. Justice White stated that "the Treaty does not obligate the State of Washington to subsidize the Indian fishery with planted fish paid for by sports fishermen." *Puyallup II* at 49.

We can find no reason to distinguish artifically cultivated shellfish from hatchery bred steelhead since the impact of the treaty is to distinguish natural sources from artificial sources. To interpret the treaty in any other fashion requires this court to literally rewrite the terms of the treaty and this we cannot do. See *Confederated Bands of Ute Indians v. United States*, 330 U.S. 169, 91 L. Ed. 823, 67 S. Ct. 650 (1947); *Northwestern Bands of Shoshone Indians v. United States, supra*; and *Choctaw Nation of Indians v. United States, supra*.

The appellants contend that the opposite result must obtain due to changed circumstances such as civilization and pollution which are claimed to have caused depletion of the natural run. We disagree. The treaty itself does not vest the Indians with any right in hatchery bred steelhead. Furthermore, the record does not demonstrate that the run has been depleted, but instead establishes that the artificially propagated run in fact augments the natural run since a hatchery bred steelhead loses its distinguishing characteristics upon returning to its native stream and henceforth is classified as a natural run steelhead. Mr. Millenbach, the Chief of the Fisheries Management Division, testified as follows:

Q. Now, does the Department of Game at no cost to the members of the Puyallup Tribe provide any services which enhance the Puyallup Tribe fishery? A. Well, the hatchery planting of smolt steelhead have contributed substantially to the net catch in the Puyallup River—the Indian net catch.

Mr. Heckman, who was called as an expert witness by the appellants and is a fishery biologist in charge of the Northwest Fisheries program, concurred in this opinion. The State thus established that the size of the natural run is increased yearly at no expense to the tribe. On the other hand, the appellants failed to introduce any evidence which substantiated their claim that the size of the natural run has in fact been depleted by the effects of modern society and, if so, the extent thereof. In conclusion, the appellants' contention that changed circumstances justify the sanctioning of a net fishery for hatchery bred steelhead cannot be justified by the treaty and is not supported by the record. Consequently, their argument must fail.

This result, which excludes hatchery bred fish from the treaty right, is further supported by consideration of equity. The evidence below demonstrated that the steelhead program conducted by the State Department of Game is nearly totally funded by the citizens of the state, primarily

via license and other "user fees."[3] It would be manifestly unfair to give one group of citizens a superior opportunity to enjoy a resource thusly provided while denying other citizens, who provide the necessary funding, equal treatment. To allow the Indians to take hatchery fish by the use of nets would be to subsidize them to the extent that other state citizens are paying for the hatchery program, while being limited solely to the much less effective hook-and-line method of fishing.[4] The Indian treaty does not demand such a subsidy. *See Puyallup II* at 49 (White, J., concurring).

We hold therefore that the Puyallup Indians have no rights in the hatchery run of steelhead other than those enjoyed by all citizens of the state. To hold otherwise would be to put the State to a Hobson's choice: either to continue the hatchery program and thus provide the Indians with additional steelhead guaranteed to be caught in their nets; or, to discontinue the program altogether and thus deny the benefits of such a resource program to all citizens of the state. Our holding in no way discriminates against the Indians because they, like all other citizens, are still free, as they always have been, to catch hatchery fish by the hook-and-line method as provided under the regulations of the State Department of Game.

We now direct our attention to the final issue. How many actual fish must be made available for that net fishery, and in what manner should this allocation be implemented?

The trial court decision below was, quite simply, an at-

---

[3]The record clearly establishes that approximately 75 percent of the Department of Game's total revenue is derived from license fees. Moreover, only 4 percent of the total statewide expenditures by the Department of Game for the steelhead program are federally derived and this amount is attributable to matching funds under the Federal Anadromous Fish Act. It is our opinion, furthermore, that even if the State Department of Game's programs were totally federally funded, the Indians, absent specific conditions on such federal financing, would enjoy only those rights available to all state citizens to the resources thus provided.

[4]We take judicial notice of the fact that one is far more likely to catch fish through the utilization of a net than with hook and line.

tempt to follow the Supreme Court's mandate in *Puyallup II*. The Supreme Court stated that the harvestable number of steelhead

> must in some manner be *fairly apportioned* between Indian net fishing and non-Indian sports fishing so far as that particular species is concerned. . . .
>
> The aim is to accommodate the rights of Indians under the Treaty and the rights of other people.

(Italics ours.) *Puyallup II* at 48-49.

In order to do this, the trial court first determined, as we have, that the Indians' treaty right does not extend to hatchery fish. It then found that the total steelhead run in the Puyallup River is composed of hatchery and natural fish in equal proportions, *i.e.*, half the run is of natural origin and half is of hatchery origin. This finding is amply supported by the record. The record also supports the trial court's finding that a 50 percent escapement factor is required for the propagation of the natural run. Fifty percent of the natural run must be allowed to spawn in order to preserve the species. The trial court thus determined, in effect, that half the total annual steelhead run was natural and that it would be consistent with conservation (escapement) requirements to harvest half of the natural run.

After making the above determinations, the trial court then disposed of the main issue—the ultimate allocation between an Indian net fishery based on the treaty and the sports fishery. Based on equitable factors, the trial court found that giving the Puyallup Treaty Indians 45 percent of the annual, natural steelhead run available for harvest would be a fair apportionment of the resource. Using estimates of the annual natural run size based on evidence relating to past steelhead runs, the trial court translated this percentage share into an exact number of fish, provided that the annual run size continued to be of the same magnitude as the run size estimates before the court.

We believe that 45 percent of the harvestable natural run was an equitable determination by the trial court in the exercise of its discretion. We cannot say from this

record that such a determination was a manifest abuse of discretion. We therefore are not disposed to disturb this holding of the trial court. *See Granite Equip. Leasing Corp. v. Hutton*, 84 Wn.2d 320, 328, 525 P.2d 223 (1974); *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

The number of fish resulting from this apportionment will probably vary, of course, from year to year depending on the size of the natural run. The evidence in the record does not clearly establish a constant annual natural run size. On the contrary, the record indicates that the run size varies from year to year. The available estimates ranged from about 4,000 in the natural run to 56,000 in the total run. It is therefore obvious that the effect of this allocation decision will be determined each year by the size of the natural run. Thus it is necessary to decide who should be charged with the duty to make this annual allocation determination.

The Department of Game is the expert state agency charged with the duty to conserve the states' game resources, including the steelhead trout. See RCW 77.12.010, .040. The Supreme Court recognized in *Puyallup II* on page 48, that conservation decisions must be made by an expert. "Only an expert could fairly estimate what degree of net fishing plus fishing by hook and line would allow the escapement of fish necessary for perpetuation of the species."

The 45 percent allocation figure of this decision applies to the harvestable amount of the annual, natural steelhead run, *i.e.*, the amount available after conservation requirements are met. This allocation will necessarily depend on the Department of Game's estimates of the natural run size each year and its annual approximations as to the harvestable number of fish in the natural run. The department's annual determination of the harvestable number of fish in the natural run, that is, its determination of the escapement requirement calculated to assure preservation of the species, will therefore determine the extent of the Indian net fishery required by federal treaty. Forty-five percent of the

harvestable natural run is the extent of this treaty right. The Department of Game's annual determination will actually yield the number of fish that the Indians can catch using nets pursuant to the treaty rights that, for purposes of this part of our opinion, we have assumed to exist.

By thus transforming the Indian right to a net fishery into an actual number of fish, it is possible to recognize this Indian treaty right in light of conservation requirements and in the context of the total annual steelhead run. The total run consists of both hatchery and natural origin steelhead, while the treaty right only applies to the natural fish. It is possible to differentiate the two types of fish by certain markings, but they are substantially identical in size and all other characteristics. In practical terms there is no way to assure that only natural fish will be caught in the Indian nets.

All of the hatchery fish are harvestable because their escapement is not required to preserve the natural run. Thus, if the Indians take annually the actual number of their treaty fish, the rest of the harvestable natural run, plus the rest of the hatchery run, will still be available to the sports fishery.[5] This method allocates the fish available, in light of conservation requirements, between the Indians' net fishery and the sports fishery—it assures that the Indian treaty right is recognized.

To summarize, in phase one of the opinion, we hold that the Puyallup Tribe's right to a net fishery under the Treaty of Medicine Creek has never been directly adjudicated. It is our belief that the treaty language "in common with" does not require that the Indians be exempted from State regulations. Rather, all that the treaty requires is that the regulations apply equally to Indians and non-Indians. Because we feel bound to follow the express language on the

---

[5] We emphasize again that the sports fishery is available to all state citizens—Indians are not preempted or precluded from participating in the hook-and-line fishery. The record shows that Puyallup Indians have in fact fished in this manner. Indians enjoy the right to sports fishery on an equal basis with other citizens except that they are not required to purchase either a license or a punch card.

face of *Puyallup II*, under phase two of our opinion, we hold that allocating 45 percent of the harvestable natural steelhead run each year to the Indian treaty net fishery is a fair apportionment between Indian net fishing and sports fishing. The Department of Game has the responsibility to determine the extent of the harvestable natural run and to accommodate this apportionment when establishing annual conservation regulations.

The judgment of the trial court is affirmed, except as to the modification thereof, wherein we direct the Department of Game to implement the annual allocation of steelhead consistent with this opinion. The first phase of our opinion is held in abeyance pending a final disposition of the treaty interpretation issue by the United States Supreme Court, at which time a reversal of the trial court decision, consistent with the first phase of this opinion, may be necessary.

HAMILTON and WRIGHT, JJ., concur.

STAFFORD, C.J. (concurring in the result)—I concur in the result reached by the majority as well as with the allocation of the steelhead trout run between the Indians and non-Indians. However, I reach the same result for different reasons.

I have reviewed *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 20 L. Ed. 2d 689, 88 S. Ct. 1725 (1967) (hereinafter called *Puyallup I*) and *Department of Game v. Puyallup Tribe*, 414 U.S. 44, 38 L. Ed. 2d 254, 94 S. Ct. 330 (1973) (hereinafter called *Puyallup II*). The totality of the facts in *Department of Game v. Puyallup Tribe, Inc.*, 70 Wn.2d 245, 422 P.2d 754 (1967) and *Department of Game v. Puyallup Tribe, Inc.*, 80 Wn.2d 561, 497 P.2d 171 (1972) when considered with *Puyallup I* and *Puyallup II* makes several things abundantly clear.

(1) Substantially all of the steelhead trout fishery occurs after their entrance into the Puyallup River; (2) that the case is concerned with the Puyallup Indians' use of setnets to catch steelhead in the Puyallup River; (3) that the only portion of the Puyallup River with which we are concerned

flows through the Puyallup Indian reservation; (4) that the present run of steelhead is made possible by the planting of steelhead; (5) that the planting program is financed in large part by the license fees paid by sports fishermen; and (6) that the central issue is the problem of accommodating the Puyallup Indians' net fishing and the non-Indian sports fishing with the conservation needs of the fishery.

It is equally clear the United States Supreme Court remanded the case for *this state court* to make a fair apportionment between Indian net fishing and non-Indian sports fishing under the above related circumstances. The majority has accomplished this in an equitable manner.

I am convinced the Supreme Court did not direct this court to resolve the apportionment problem as an empty gesture. It is only logical to assume that once a formula resulting in fair distribution was achieved that the fair allocation should, insofar as possible, be maintained. If this assumption is not correct, then much of the language in *Puyallup II* is meaningless.

At first blush it would appear that the State lacks the necessary power to enforce the equitable apportionment directed by the United States Supreme Court. In this regard see such cases as *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 20 L. Ed. 2d 697, 88 S. Ct. 1705 (1968); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L. Ed. 483 (1932); *Kimball v. Callahan*, 493 F.2d 564 (9th Cir. 1974); *Moore v. United States*, 157 F.2d 760 (9th Cir. 1946); *see also Seufert Bros. Co. v. United States*, 249 U.S. 194, 63 L. Ed. 555, 39 S. Ct. 203 (1919); and *United States v. Winans*, 198 U.S. 371, 49 L. Ed. 1089, 25 S. Ct. 662 (1905). On the other hand, it is only logical to assume the Supreme Court is equally aware of the above cited cases and had them in mind when the following broad language was used in *Puyallup II* at page 49:

The aim is to accommodate the rights of Indians under the Treaty and the rights of other people.

We do not imply that these fishing rights persist down to the very last steelhead in the river. *Rights can be controlled by the need to conserve a species;* and the

time may come when the life of a steelhead is so precarious in a particular stream that all fishing should be banned until the species regains assurance of survival. *The police power of the State is adequate to prevent the steelhead from following the fate of the passenger pigeon; and the Treaty does not give the Indians a federal right to pursue the last living steelhead until it enters their nets.*

(Italics mine.)

When one considers the fragile nature of the fishery involved, as well as the state's physical and financial support of that resource, it is easy to understand the above quoted language. If the Supreme Court had not recognized the existence of a state power to control and supervise the mandated allocation, the Supreme Court's direction would, for all practical purposes, be impossible to establish, implement, and enforce. Without question the Supreme Court did not intend to direct the State of Washington to perform a useless act.

For this reason, I am willing to accept the above quoted portion of *Puyallup II* at face value and concur in the result reached by the majority.

WRIGHT, UTTER, and HOROWITZ, JJ., concur with STAFFORD, C.J.

ROSELLINI, J. (concurring)—I concur in Justice Hunter's scholarly interpretation of the Medicine Creek Indian Treaty. This interpretation should dispose of the case. However, Justice Hunter felt compelled by the language found in *Department of Game v. Puyallup Tribe*, 414 U.S. 44, 38 L. Ed. 2d 254, 94 S. Ct. 330 (1973), to review the determination of the amount of catchable fish to be apportioned between the commercial Indian net fishery and the hook and line fishery of other citizens.

I believe that any apportionment of the fish run is contrary to the treaty and the Constitutions of the United States and Washington. Apportionment cannot be sustained by the law, or the facts in the case.

I find nothing in the language of the Treaty of Medicine

Creek, 10 Stat. 1132, or in the Treaty of Point Elliott, 12 Stat. 927 (2 *Indian Affairs Laws and Treaties* 669 (1904)), that would even imply that fish runs were to be apportioned between the Indians and the white settlers. In fact, the treaties negate any such interpretation.

The exact language of the treaty incorporated as it was in other similar treaties contemporaneously negotiated with tribes makes it clear that Indians were not to be excluded from fishing at their accustomed grounds, but these rights were to be coextensive only with the citizens of the territory. Thus, the Indians shall have all fishing rights that all the citizens have, and no Indian or non-Indian shall have any superior right.

Any other interpretation would distort the obvious meaning of the language.

Article 3 of the Treaty of Medicine Creek, as noted, says:

ARTICLE III. The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, *in common with all citizens of the Territory,* and of erecting temporary houses for the purpose of curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses on open and unclaimed lands: *Provided, however,* That they shall not take shell fish from any beds staked or cultivated by citizens, and that they shall alter all stallions not intended for breeding horses, and shall keep up and confine the latter.

(Italics mine.) 10 Stat. 1133.

There is no word in any of the articles or in any other treaty to suggest that either the Indians or the white settlers intended that Indian tribes have a superior right to fish not equally available to citizens of the territory.

The treaty made with the Quinaielt, Quillehute and other tribes, 12 Stat. 971-72 (2 *Indian Affairs Laws and Treaties* 719-20 (1904)), employs identical language to the Treaty of Medicine Creek concerning the right of taking fish in common with all citizens of the territory.

The Treaty of Point Elliott, 12 Stat. 927, 928, with the Dwamish, Suquamish, and other tribes employs the same

language used in the Treaty of Medicine Creek and the treaty with the Quinaielt and Quillehute:

> ARTICLE V. The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands. Provided, however, that they shall not take shell-fish from any beds staked or cultivated by citizens.

None of these treaties contains a hint that the Indians would acquire fishing rights superior to the citizens of the territory, or that the Indians would have a property right to 45 percent of the fish runs or any fraction of any fish run. The treaty gave the Indians and settlers a right to be held in common—the privilege or opportunity of catching fish.

Similarly, in the Treaty of Point No Point, 12 Stat. 933, 934, article 4 declares that

> [t]he right of taking fish at usual and accustomed grounds and stations is further secured to said Indians, in common with all citizens of the United States; . . .

It will be noted that there is a minor departure from the language of the three other treaties in describing the settlers as citizens of the United States rather than as citizens of the territory. One cannot find from this treaty or the three other treaties any language which gives exclusive off-reservation fishing rights or any apportionment of the fish runs.

What the treaties said is that Indians should not be barred from an opportunity to fish any more than the settlers were denied the right to do so.

A treaty signed in June 1855 in Walla-Walla Valley between the United States and the Walla-Walla Tribe, 12 Stat. 945, 946, illustrates that the Indians and United States were capable of using explicit language when it was desired to give exclusive rights to Indians to fish. Article 1 of the treaty says

[t]hat the exclusive right of taking fish in the streams running through and bordering said reservation is hereby secured to said Indians, and at all other usual and accustomed stations in common with citizens of the United States, and of erecting suitable buildings for curing the same; the privilege of hunting, gathering roots and berries and pasturing their stock on unclaimed lands in common with citizens, is also secured to them.

It can be seen that in the Walla-Walla Treaty, the Indians reserved the exclusive right to take fish from streams running through and bordering said reservation and outside their reservation in common with the citizens of the United States. There was no difficulty in selecting the words to convey the separate ideas of "exclusive rights" and "rights secured in common" with the citizens of the United States.

The precise distinction between exclusive and shared rights held in common with the citizens of the territory were made in a treaty with the Yakima Indian Tribe. (*See* 12 Stat. 951.)

A reading of all the treaties which were signed at about the time of the Medicine Creek Treaty in 1854 makes it clear that where an exclusive right was intended, and when a right to fish in common with the settlers or citizens was intended, language was used precisely to express the idea of exclusive rights and nonexclusive rights.

If it was intended to give 45 percent or any other portion of the fish runs to Indian or white citizens, language could have been used to express that intent. I find not even a hint that this was the intent of the treaties. I am sure that a treaty which would have given away any percentage of the fish runs would not have been ratified.

It must be remembered that the United States was inhabited by persons who left their homeland because of religious or political discrimination. They left also because of the economic discrimination. It must be remembered that game belonged to the King and to the estates of the lords. No one could hunt or fish without the consent of the King or the lords. In fact, poaching was a crime punishable

by imprisonment or death. Thus, it would have been inconceivable that the citizens or settlers of the United States would have allocation of fish or game.

In any event, article 6 of the United States Constitution reads:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land;
> . . .

It will be seen that the United States Constitution, the laws made pursuant thereto, and the treaties are the supreme law. The laws enacted must pass the test of constitutionality. The treaties which are passed may not violate the constitution and may not deprive the citizen of any of his constitutional rights.

Treaties are part of the domestic law and where, as in this case, both parties to the treaties are citizens of the United States, the provisions of the constitution apply. Otherwise, the Executive and the Senate could by treaty which involves rights of its citizens disenfranchise a class of citizens. Any treaty right that gives Indians superior rights denies the equal protection of other "citizens' " rights.

Let me further state why I think an apportionment of the fish run is legally incorrect.

It must be remembered that the steelhead fishery is financed by the purchase of fishing licenses and steelhead tags by the fishermen. None of the taxpayers' money is used for hatchery planting programs in restocking the rivers, except a very small amount furnished by the federal government.

Without the hatchery-reared steelhead planted in the rivers, there would not be any fish to catch and there would not be a natural run. My conclusions are based upon the following facts which logically follow from the planting statistics, and take into account the misconception of what is natural and what is native steelhead.

The record disclosed that natural or native steelhead is

arbitrarily defined as any steelhead that does not have any hatchery marking. The record disclosed that the progeny of the hatchery-planted steelhead under this definition is arbitrarily counted as a natural run of steelhead.

The following chart which sets forth the planting and catch of steelhead illustrates to my mind that without the large planting, the return of the steelhead would be minimal.

PUYALLUP RIVER SYSTEM STEELHEAD PLANTS AND CATCH

| Winter Season | Cycle Plant[1] | Indian[2] | Sports | Total |
|---|---|---|---|---|
| 1947–48 | | | 1,937 | 1,937 |
| 49 | | | 4,644 | 4,644 |
| 50 | 52,000 | | 7,443 | 7,443 |
| 51 | 18,000 | | 6,037 | 6,037 |
| 52 | 33,000 | | 15,660 | 15,660 |
| 53 | 66,000 | 104 | 14,566 | 15,670 |
| 54 | 74,000 | 2,671 | 19,296 | 21,967 |
| 55 | 70,000 | 2,029 | 14,490 | 16,519 |
| 56 | 47,000 | 2,308 | 20,348 | 22,656 |
| 57 | 70,000 | 2,554 | 14,184 | 16,738 |
| 58 | 57,000 | 2,960 | 8,794 | 11,754 |
| 59 | 58,000 | 2,740 | 7,528 | 10,268 |
| 60 | 55,000 | 4,506 | 9,547 | 13,053 |
| 61 | 63,000 | 2,917 | 4,684 | 7,601 |
| 62 | 79,000 | 2,629 | 10,419 | 13,048 |
| 63 | 57,000 | 1,834 | 11,717 | 13,551 |
| 64 | 65,000 | | 15,942 | 15,942 |
| 65 | 63,000 | | 6,914 | 6,914 |
| 66 | 93,000 | | 18,761 | 18,761 |
| 67 | 65,000 | | 15,971 | 15,971 |
| 68 | 100,000 | | 16,971 | 16,971 |
| 69 | 67,000 | | 11,602 | 11,602 |
| 70 | 98,000 | 500 | 6,738 | 7,238 |
| 71 | 124,000 | 1,500 | 12,101 | 13,601 |
| 72 | 123,000 | | 9,648 | 9,648 |
| 73 | 122,000 | 317 | 4,015 | 4,332 |
| 74 | 107,000 | 1,105[2,500–3,000][3] | [4,472] | |
| 75 | 75,000 | | | |
| 76 | 68,000 | | | |

[1]Cycle plants made 2 years prior to winter season, i.e., cycle plant of 52,000 (1950) was made in 1948 and contributed to the catch of 7,443 fish in 1949–50 winter season.

[2]Data represents White River and Puyallup Indian catch as available and is incomplete.

[3]The numbers appearing in brackets are not part of the exhibit.

Respondent's Brief, Appendix; Exhibit 74-2.

Without the massive infusion of the hatchery fish, the steelhead runs subject to the net fishery would have been depleted.

The evil of permitting net fishing for steelhead is that it will devastate the run. The net fishery on the Skagit River exceeds 57 nets. Many of the nets are placed alternatively from one side of the river to the center of the river. The nets on the opposite side are placed alternatively so that they intersect the nets placed on the other side of the river. The effect is to block all upstream fish.

Steelhead are different from salmon, which spawn and die. Steelhead will spawn and live to return to spawn again. They are in a very poor condition after spawning and are regarded as unfit to eat. The nets not only take all the steelhead going upstream to spawn, but will catch all the steelhead which have already spawned and are returning downstream.

Runs of steelhead enter rivers at different times during the season. It is possible to deplete the run at a certain period. It is urged that proper regulation can control this situation; however, the record is replete with evidence that net fishery cannot be successfully regulated.

The inefficiency of the enforcement of the regulation is shown by the fact that in December 1975, the Indians caught 2,476 fish on the Puyallup River, while 1,341 sportsmen fishing by line and hook caught only 102. In Western Washington Green River, 12,000 non-Indians caught only 50 fish, while Indian netters took 4,839. On the Skagit River, 893 sportsmen caught 89 fish while the Indians netted 2,367 fish.

Conservation means the wise use of the resource, and in the management of steelhead there must be necessary escapement for needed spawning to insure the perpetuation of the resource.

The manner of fishing must be such that it can be controlled so it does not impair or damage the necessary escapement; and, further, the manner of fishing itself must not be destructive. The Department of Game, in order to con-

serve the steelhead runs, has placed limitations on the manner of fishing and the catch limit of steelhead. Non-Indians must fish with line and hook (as opposed to the Indian net fishing), and the non-Indian is limited to the maximum of 2 per day and no more than 4 in possession, and a maximum of 30 per season.

This case is entitled "Department of Game v. Puyallup Tribe, Inc." It suggests that the tribe itself is benefiting from the net fishery. However, the record shows that there are approximately 850 members of the Puyallup Tribe, of which 320 are over the age of 21. *Twenty* Puyallup Tribe fishermen fish essentially full time, 20 part-time, and an additional 20 fish only occasionally. The commercial value of steelhead caught by the Indians is approximately $10 a fish. The individual fishermen keep the proceeds of their fish sales, and this money is not shared with the tribe.

How can an apportionment of the catch, as found by the court, of 45 percent of the fish runs be equitable, fair, or conscionable when 60 Indians are allocated such a large proportion and thousands of non-Indians must share the remainder?

Under the Treaty of Medicine Creek, the only guaranty to the Indians is a right to the opportunity to fish. The treaty did not guarantee them any portion of the fish. Even if apportionment is permitted, should not the fish be divided more equitably between the non-Indian sportsmen and the Indians?

It must be remembered that before the incredible doctrine of apportionment was announced, the Indians had the same right to fish, and in the same manner as non-Indians. The treaty Indians could fish as sportsmen or as commercial fishermen, whether it was by troller, gillnetting, or setnet.

Heretofore, all citizens, whether Indians or non-Indians, were treated as equals. Now the courts have decided the rights of other citizens are inferior to Indian rights. I cannot subscribe to such a doctrine. I would hold that the treaty does not permit or contemplate any allocation of the

698

fish, but rather the opportunity to fish and catch fish in the same manner as any citizen. I would take cognizance of the fact that fishing with fixed nets will devastate the fish runs and jeopardize one of the great natural resources of this state—a result which could never have been intended by any party to these treaties.

BRACHTENBACH, J., concurs with ROSELLINI, J.

Petition for rehearing denied June 25, 1976.